

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

Eric Junod (#51349-039),

       Petitioner,

   v.                    Case No. 24-12399

Eric Rardin (Warden),       Honorable Stephen J. Murphy, III

       Respondant.

_____/

REPLY TO GOVERNMENT'S RESPONSE TO PETITION FOR

WRIT OF HABEAS CORPUS UNDER SECTION 2241

FILED

DEC 1 1 2024

U.S DISTRICT COURT
EASTERN MICHIGAN

REPLY TO GOVERNMENT'S RESPONSE TO PETITION FOR WRIT OF

HABEAS CORPUS UNDER SECTION 2241

Petitioner notes that he is "Pro Se" and that per Haines v. Kerner 404

US 519(1972) the Court must construe Petitioner's filings liberally and hold

them to a less stringent "standard" than pleading drafted by lawyers.

Respondent also notes that he had assistance in preparing this reply by

knowledgeable law library clerks. In this response Petitioner will clearly

demonstrate that the United States Attorney's Office, like the Federal Bureau

of Prisons (The "BOP") before them, is stubbornly refusing to follow the laws

of the United States, the BOP's own promulgated regulations, and the BOP's

own internal governing documents regarding the calculation and application

of the time credits ("FTCs") under the First Step Act of 2018 (the "FSA").

As a result, Petitioner's petition for Writ of Habeas Corpus (the "Petition")

should be granted forthwith.

ARGUMENT

(A.) The FSA provides that:

(C) Application of TIME CREDITS towards Prerelease Custody or supervised
release - Time Credits earned under this paragraph by prisoners who
successfully participate in Recidivism Reduction Programs or Productive
Activities shall be applied toward time in prerelease custody or supervised
release. The Director of the Bureau of Prisons shall transfer eligible
prisoners, as directed under Section 3634(g) 18 U.S.C.S. 3634 (g) into
Prerelease Custody or Supervised Release. 18 U.S.C.S. 3632(d)(4)(c) emphasis
added.

Respondent does not dispute that Petitioner is an "Eligible Prisoner", that

he has "successfully participated in Recidivism Reduction Programs or

Productive Activities" and that he has therefore "earned" FTCs under the FSA

that are required to be applied as follows:

(i) First to accelerate the date that his Supervised Release commences by

365 days from the date he would otherwise have been released from BOP custody

2

to Supervised Release (such date being defined by the BOP as the "FSA Conditional Release Date") and (ii) second, to set the date that he <u>must</u> be transferred from institutional custody at FCI Milan to Prerelease Custody according to the number of FTCs he has earned or will earn under the FSA (such date being defined by the BOP as the "FSA Conditional Placement Date"). Respondent argues that Petitioner has not earned enough FTCs to be released to Prerelease Custody. Specifically, Respondent claims that the FSA Conditional Placement Date set forth on the BOP's FSA Time Credit Assessment dated 10-12-2024 (attached hereto as EXHIBIT A, the "October Assessment")"reflects the maximum amount of FTCs an eligible individual can earn towards Prerelease confinement" (response to petition, P.5). With this, Respondent is in effect asserting that eligible prisoners suddenly stop earning FTCs upon their transfer from an institution to Prerelease Custody even though they are clearly still in BOP custody (and should therefore still be earning FTCs) during that entire period.

> FN1:
> This can plainly be seen by examining the difference between the "maximum" 1,110 FTCs Respondent calculated on Petitioner's October Assessment (consisting of 365 FTCs applied to the FSA Projected Release Date and 745 "FSA Conditional Placement Days" available to be applied to Prerelease Custody) and the 1,020 FTCs Petitioner had already earned as of the date of the October Assessment (October 12, 2024)( as included in the upper right hand box on page 1 of the October Assessment which shows "FTC towards release: 365" and "FTC towards RRC/HC: 655 for a total of 1,020 FTCs) the 90 FTC difference between the 655 FTCs shown on page 1 and the 745 shown on page 2 under "FSA Conditional Placement Days" is <u>exactly</u> the number of FTCs that <u>will be earned</u> by Petitioner between the date of the October Assessment and the planned transfer to Prerelease Custody on the "FSA Conditional Placement Date" of May 15, 2025. This clearly shows that the BOP stops calculating the earning of FTCs on the date that they show Prerelease Custody commencing.

As shall be demonstrated below, this is very clearly incorrect and inconsistent with the langauge of the FSA, Congressional intent and the BOP's own implementing regulations and internal guidelines and is resulting in numerous eligible prisoners, such as Petitioner, not receiving a substantial number of FTCs that

they are in fact entitled to.

> FN2:
> This position is, unfortunatly, entirely consistant with the BOP's
> continued attempts to circumvent laws that they don't agree with,
> thereby usuring Congresses constitutional lawmaking powers. All too
> often these attempts are successful due to the gross disparity in
> resources and knowhow available to the average incarcerated prisoner
> and the combined resources of the BOP. Thanfully, the founding fathers
> placed a check on usurpation of lawmaking powers by the Executive
> Branch - the Judiciary that this District Court is an integral part
> of. The Supreme Court recently took a strong stand against such
> usurpation in its decision in Loper v.Raimondo to overturn Chevron v.
> Natural Resourses Defense Council (Coper v. Raimondo, 219 LED2D 832,
> 2024 LEXIS 2882 (2024)). There the court removed the need for judicial
> deference to administrative agencies when reviewing the validity of
> administrative rule making (which includes, in the BOPs case, Program
> Statements). Thus federal courts are free to overturn BOP regulations,
> program statements and actions to the extent that they conflict with
> clearly expressed statutory authority. This same judiciary has also
> been empowered through the Writ of Habeas Corpus process to stop
> illegal detentions such as that of Petitioner.

Petitioner asks the Court to require the BOP to follow the law by beginning to

calculate Peitioners FTCs correctly (and to instruct the BOP to do so for all

other similarly situated prisoners) such that their calculations take into

account the potential to earn FTCs during the entirety of an eligible prisoners

time in BOP custody, including while in Prerelease Custody, as the FSA and

Congress clearly intended, and to, as a result, order the immediate transfer

of Petitioner to Prerelease Custody.


## ANALYSIS OF THE LAW

(B.) Sections 3634(g)(1) and (2) of the FSA mandate that the BOP place

eligible prisoners who have earned FTCs and meet other specified criteria

in Prerelease Custody consisting of either a Residential Reentry Center

or Home Confinement. This is not optional, not subject to discretion,

and not subject to available bed space or other resource constraints.

FN3:
In fact Congress specifically funded and mandated this: "The Director of the Bureau of Prisons shall ensure there is sufficient Prerelease Custody capacity to accomodate all eligible prisoners." 18 U.S.C.S. 3624(2)(11) . The BOP has had 6 years (along with tens of millions of dollars of earmarked funds) to implement this mandate.

The Respondents statement that "FSA Time Credits may not be applied to Prerelease Custody until the amount of earned Time Credits equals the remainder of the prisoners imposed term of imprisonment." (reply to Petition, P.4), while accurate insofar as it goes, in being intentionally misconstrued and/or misapplied in two fundamental ways (i) first, an eligible prisoner continues to earn FTCs the entire time they are in BOP custody including while in Prerelease custody. And (ii) second, the eventual application of current and future earned FTCs happens on the date on which those FTCs are "used" by their application. Thusly, by definition "application" of FTCs can only happen after the FTCs have been earned and therefore, of course, "unearned" FTCs cannot be "applied".

FN4:
The earning and application of FTCs, of course, assumes that the eligible prisoner continues to meet other requirements of the FSA. This is exactly the same situation as with Federal Good Time Credits ("GTCs").

The continued earning of FTCs while in Prerelease Custody is clearly envisioned by: (i) The BOP's final regulations implementing the FSA, (ii) the BOP's own formal program statements, and (iii) materials promulgated by the BOP to prisoners explaining the FSA. These shall each be addressed in detail below.

(i) The publication by the BOP of the final rule codifying the BOPs procedures regarding earning and applying FTCs in the Federal Register on January 19, 2022 (the "Final Rule") was the final step in the long process of drafting and publishing proposed regulations and receiving and considering feedback from various interested parties regarding those proposed regulations (including members of Congress who sponsered the FSA). In addition to the actual final

5

regulations, the final rule included an extensive discussion about comments it received and the BOP's responses to such comments. One of those comments and responses address the exact situation under consideration here.

Specifically: Federal Register, Vol.87,No.12,Pg.2712 (January 19,2022). Emphasis added (attached hereto as Exhibit "B")

COMMENT:  Earning FSA Time Credits should continue in Residential Reentry Centers and/or while in home confinement.

Many commenters raised an issue that was articulated by Senator Sheldon Whitehouse (D-RI) and Senator John Cornyn (R-TX) as follows:

The proposed rule also provides that "FSA Time Credits can only be earned while an inmate is in a Bureau facility, and will not be earned if an inmate is in a Residential Reentry Center or on home confinement." The proposed rule does not cite to any authority for this restriction, and this interpretation is not consistent with the goals of the First Step Act.

Allowing individuals to earn time credits while in RRCs is authorized by the First Step Act. The Act provides that "[t]ime credits earned... by prisoners who successfully participate in recidivism reduction programs or productive activities shall be applied toward time in Prerelease Custody or supervised release." It defines "prisoner" as "a person who has been sentenced to a term of imprisonment pursuant to a conviction for a Federal criminal offense, or a person in the custody of the Bureau of Prisons."

Because "[p]re-release inmates at an RRC remain in Federal custody while serving a sentence imposed by a U.S. District Court or DC Superior Court," they are "prisoners" for the purposes of the First Step Act. Nor does the First Step Act distinguish between "prisoners" who are serving their sentence in a BOP institution, in an RRC, or on home confinement in describing the time credit program. By its own terms, the statute allows BOP to award time credits to individuals incarcerated in an RRC toward time in supervised release.

Allowing individuals incarcerated in an RRC to earn time credits by particiapting in EBRRs would further the purposes of the First Step Act. RRCs offer substance abuse treatment and other programs similar to those offered in BOP institutions. There is no reason to believe that a program offered in an RRC will reduce recidivism any less than one offered to an individual in prison. In fact, such programs may be more effective, as individuals are close to release from custody and can begin putting lessons learned into practice as they transition home. BOP should revise the proposed rule to allow individuals to earn time credits while in an RRC.

Congressman Hakeem Jeffries [D-NY] also stated, "I see no reason to make individuals in Residential Reentry Centers [RRCs] or in home confinement ineligible to earn time credits. ...Congress could have used a narrower definition or explicitly excluded certain categories of individuals based on where they serve their sentence, but it chose not to do so."

RESPONSE: After carefully considering the comments received, the Bureau agrees that inmates in prerelease custody-whether in a residential reentry center [RRC] or on home confinement-are eligible to earn FSA Time Credits under 18 U.S.C. 3632(d)(4)(A), which they could presumably apply, under 18 U.S.C. 3632(d)(4)(C), toward transfer to supervised release.

Nothing could more clearly state the law, Congressional intent and the BOP's acknowledgement of the law and Congressional intent regarding the continued earning of FTCs by eligible prisoners while in Prerelease Custody.

(ii) further demonstrating that the BOP clearly understands that FTCs continue to be earned while in Prerelease Custody are multiple statements in the BOP's own Program Statement 5410.01: "First Step Act of 2018-Time Credits: Procedures for implementation of 10 U.S.C. 3634(d)(4)" issued on November 18,2022. ("PS5410.01.01", attached hereto as Exhibit "C"). These statements would make no sense if FTCs did not continue to be earned while in Prerelease Custody.

For example:
> [t]he Bureau will calculate an inmate's PRD by assuming that an inmate will remain in earning status throughout his or her sentence, including while in prerelease custody.[...] If an inmate is returned to prison for a violation during prerelease custody or any other reason, their projected FTCs may be adjusted depending on,any failure to remain in earning status. PS 5410.01, Pg. 17.

Regarding the required periodic reassessments of the prisoners eligibility:
> An inmate will be reassessed for both risk level and needs at each regularly scheduled Program Review throughout the remainder of the inmate's incarceration at a BOP institution. [...] Inmates placed in prerelease custody, and who are not subject to regularly scheduled program review, will not receive reassessments. For inmates in prerelease placement, reassessments will be completed automatically on a monthly basis and will capture changes which occur during prerelease placement. ID. at Pg.9.

Further to this point:
> For inmates in prerelease custody, "the most recent two consecutive risk assessments" refers to the final two risk assessments conducted while an inmate was at a BOP institution, prior to the application of FTCs, i.e., the inmate's transfer to supervised release or prerelease custody, reassessments will be completed automatically on a monthly basis and will capture changes which occur during prerelease placement. ID. at Pg.11.

Finally, making it clear that the BOP understands FTCs are earned during the entirety of the eligible prisoners time in Bureau custody:
> Further, an inmate cannot earn FTC when not in Bureau custody, including when in U.S. Marshalls Service custody prior to arriving at their designated facility, regardless of where they are housed, or once released to their supervised release term. Id. at Pg.10.

7

These statements clearly show the BOP knows that FTCs continue to be earned while in Prerelease Custody.

(iii) The BOP issued to prisoners the "First Step Act Admission and Orientation (A&O) Addendum" ("FSA A&O Addendum" attached hereto as Exhibit D) in November 2023. It contained information regarding the FSA in an easily digestible Q&A format and included the following:

> Do I earn FTCs while in Halfway and/or Home Confinement?
>
> Yes. As long as you continue to successfully program. Remember incident reports can result in a change in your PATTERN Risk Level. If this happens while in Halfway House and/or Home Confinement, it can also impact both your earning status and your ability to apply FTCs toward your release. If your PATTERN Risk Level increases to Medium or High Risk for any reason, you will no longer be eligible to apply your FTCs, and may be removed from prerelease placement and returned to the institution. FSA A&O Addendum, Pg.9.

This exactly comports with Petitioner's understanding of the law and directly refutes Respondant's assertions to the contrary. As the above makes abundantly clear, the Respondant's assertion that eligible prisoners do not continue to earn FTCs while in Prerelease Custody is patently false. As previously noted, the BOP's strained reliance on out of context FSA language includes the misapplication of the language regarding "applying" earned FTCs. To this end, the Respondent states that "The BOP is not authorized to apply future potential unearned FTCs to a prisoners sentence computation" (response to Petition, Pg.6). The BOP desperately wants the Court to infer that this stands for the proposition that the BOP cannot calculate the date that Prerelease Custody should commence or  transfer the eligible prisoner to Prerelease Custody based on FTCs to be earned in the future by eligible prisoners while in Prerelease Custody. However, what the statement actually stands for is a much narrower proposition: on any given date, the BOP may only use FTCs that have already actually been earned as of that date. Put another way: the "application" of FTCs happens over time as does the "earning" of FTCs. Yes, FTCs must be "earned" before they eventually can be "applied", but neither the language of the FSA or the clear

intent of Congress supports the BOP's assertion that this somewhow means that every single FTC has to have been earned in advance of using presumptively earned FTCs to calculate correct dates for transfer to Prerelease Custody and Supervised Release. Even the BOP's current, flawed, assessment tool utilizes projected FTCs that are yet to be earned while still in institutional custody in calculating the date of transfer to Prerelease Custody. This statement also does not somehow relieve the BOP from complying with the FSA's requirement that it actually apply all earned FTCs. FN6:

> FN6: See 18 U.S.C.S 3632 (d)(4)(C)
> "Time Credits earned...shall be applied towards Prerelease Custody or Supervised Release. The Director of the Bureau of Prisons shall transfer eligible prisoners... into Prerelease Custody or Supervised Release.)

Finally, the Petitioner notes that numerous other District Courts have ruled on this very issue in favor of the Petitioner  prisoners and against the BOP. Probably the best example of these decisions can be found in Woodley v. Warden, 2024 U.S. Dist. LEXIS 87521 (May 15, 2024) where the Judge sets forth a fairly full analysis of the law and the reasoning behind his decision. The full text of the decision is attached hereto as Exhibit "F".

REPLY TO SPECIFIC ELEMENTS OF RESPONDANTS RESPONSE

(C) Respondant attempts to mislead the Court in its response to the Petition when it relatively creatively misquotes the FSA as to how FTCs are to be applied: "only"earned" FTCs "shall be applied towards time in Prerelease Custody or Supervised Release."" Response to Petition, P.3 and P.8, "Quoting" 18 U.S.C.S 3632 (d)(4)(C). The actual full text of 3632 (d)(4)(C) does not in any way stand for the proposition claimed by the Respondant and, in fact, instead contains a Congressional admonishment to the BOP that it shall apply earned credits and shall transfer eligible prisoners into Prerelease Custody or Supervised Release. Please see the full text of 3624 (d)(4)(C) set forth at the beginning of Section (A) of this document.

9

What the Respondant is studiusly avoiding is acknowledging that the FSA clearly intends for eligible prisoners to continue to earn FTCs while in Prerelease Custody and for all of those FTCs to be applied to either additional Prerelease Custody or Supervised Release. The Respondant seems to claim that merely calculating this is somehow "not authorized" and a practical impossibilty but in reality, doing so is both required under the FSA and quite simple.

For every 30 days of planned Prerelease Custody shown on the BOPs current Assessment Tool an additional 15 FTCs (10 FTCs in some, limited, circumstances, not applicable here) should be projected to be earned and the FSA Conditional Release Date should be moved up accordingly. For example, Petitioner, as an eligible prisoner currently earning 15 FTCs per month and who will have earned FTCs such that he would be transferred to Prerelease Custody for Twenty Four months based solely on FTCs already earned while in institution custody, would be projected to earn an estimated additional 360 FTCs (15 FTCs per month for 24 months) during this 24 month period (absent some action that would remove him from eligibilty). This projected additional 360 days would result in transfer to Prerelease Custody approximately one year earlier than already projected. As previously shown, Congressional intent is clear that FTCs can and should be earned while in Prerelease Custody and those FTCs must be applied to transfer to Prerelease Custody or Supervised Release.

In summary, correctly calculating FTCs to include those to be earned while in Prerelease Custody is not rocket science and is required by law, and the BOP must be stopped from continuing to refuse to do so.  FN7:

> FN7:
> It should be noted that the BOP has known how to calculate this correctly from the beginning. The first version of its FSA Time Credit Assessment Tool (attached hereto as Exhibit "E") as used in Petitioners September 3rd, 2024 assessment calculated FTCs in exactly this way and, in fact, determined the correct number of FTCs to be earned in the future by Petitioner and thereby correctly determined the date that he should have been transferred to Prerelease Custody (April 20,2024).

Respondant also asserts in its response, that because earned FTCs can be taken away from a prisoner for misconduct (including a change in their recidivism risk level due to such misconduct) that it is impossible to project future earned FTCs. As Petitioner has already shown this is absurd.

First, their current Assessment Tool already makes projections utilizing FTCs not yet earned - it just stops making those projections at too early a date (i.e. the date Prerelease Custody starts verses the correct date which is the date Prerelease Custody ends).

Second, as quoted extensively prior, Program Statement 5410.01 shows that the FSA and the BOP clearly have mechanisms to both estimate and project "future to be earned" FTCs and to remove FTCs for bad behavior. The possibility of recalculation FTCs and even removing a prisoner from Prerelease Custody back to institutional custody has no bearing on the ability to correctly calculate FTCs for the entire time an eligible prisoner is in BOP custody and using those correctly calculated FTCs to determine the correct date of transfer to Prerelease Custody.

Additionally, Respondent's constant refrain that the dates given in the FSA Time Credit Assessment are an "estimate" a "planning tool", or "are not guaranteed and subject to change based on behavior" (each found on Response to Petition, Pg.7) in no way relieves the BOP from correctly calculating FTCs to include those earned during the entiity of an eligible prisoners time in BOP custody as Congress intended.

Third, Congress clearly intended that FTCs be earned and applied to reduce the time eligible prisoners are in institutional custody by maximizing the time they are in Prerelease Custody or Supervised Release. The BOP acknowledged this at the time of the issuance of the final rule.

Fourth, the BOPs original assessment tool correctly calculated this to arrive at the correct date. The BOP, presumably, retracted this tool not because

it was incorrect but rather because they wanted to be able to obsfucate how these dates are to be calculated, thus preserving their ability to "spin" the results to lengthen the institutional custody period for thousands of prisoners, like the Petitioner.

Finally, for the sake of completeness, Petitioner will respond to two assertions of Respondent made in its Response that while clearly grasping at straws must nonetheless be addressed. First, Respondent asserts that "Habeas claim cannot be sustained based solely upon the BOPs purported violation of its own Program Statement" (Response to Petition, Pg.8), but even granting for argument's sake that this is correct, Petitioner is not basing his habeas claim on this limited basis but rather based on Federal law as set forth in the FSA and as supported by clear Congressional intent. Second, Respondent incorrectly cites 18 U.S.C.S. 3621(b) for the proposition that this Court may not order Petitioner's placement into an RRC. This is incorrect as it is inapplicable to this circumstance. While it is true that a Court may not overrule which particular prison the BOP chooses to place a prisoner in, the statute does not strip the Court of its inherent power to interpret and enforce the law generally nor does it stop the Court from ordering the transfer of Petitioner into either Prerelease Custody or into Home Confinement as required under Sections 3632(d)(4)(C) and 3634(g)(2) of the FSA (18 U.S.C.S. 3632(d)(4)(C) and 3634(g)(2). The BOP may choose whether to transfer an eligible prisoner to Home Confinement or a Residential Reentry Center, but it MUST choose one and this Court most certainly has the power to force the BOP to take that required action.

CONCLUSION

For the foregoing reasons the Petitioner asks the Court to find as follows:

(1) the Respondent has incorrectly calculated Petitioner's earned and to be earned FTCs by refusing to project FTCs to be earned during the entirety of Petitioner's Prerelease Custody period;

(2) that this error would, when corrected, yield an additional approximate 360 FTCs, FN8:

FN8:
15 days per month for 24 months of currently scheduled Prerelease Custody, that must be used by the BOP in calculating the date Petitioner should be transferred to Prerelease Custody.

(3) that with these additional 360 FTCs Petitioner should have long ago been transfered to Prerelease Custody;

(4) if Prerelease Custody space is not immediately available (despite Congress' mandate that it be made available) that Petitioner be transferred to Home Confinement in the alternative as required by the FSA; and

(5) to effectuate the foregoing, the Petitioner's Petition for Writ of Habeas Corpus be granted without delay.

Respectfully submitted,

Eric Junod # 51349-039

Certificate of Service

   I, Eric Junod, being of sound mind, do hereby CERTIFY under penalty of
perjury and pursuant to Title 18 §1746 that all statements made and documents
presented herein are true and authentic to the best of my knowledge. A copy
of this Reply to Government's Response to <u>Petition for Writ of Habeas Corpus</u>
under Section 2241 has been placed in the prison mail system at FCI Milan,
Milan Michigan addressed to the United States District Court, Eastern District
of Michigan.

Executed this 2nd day of December, 2024.

                                           /s/ _____
                                               Eric Junod 51349-039

EXHIBIT A

## FSA Time Credit Assessment
Register Number:51349-039, Last Name:JUNOD

**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU OF PRISONS**

| | |
|---|---|
| Register Number....: 51349-039 | Responsible Facility: MIL |
| Inmate Name | Assessment Date.....: 10-12-2024 |
|   Last............: JUNOD | Period Start/Stop...: 12-21-2018 to 10-12-2024 |
|   First...........: ERIC | Accrued Pgm Days....: 2122 |
|   Middle..........: | Disallowed Pgm Days.: 0 |
|   Suffix..........: | FTC Towards RRC/HC..: 655 |
| Gender............: MALE | FTC Towards Release.: 365 |
| Start Incarceration: 05-15-2017 | Apply FTC to Release: Yes |

| Start | Stop | Pgm Status | Pgm Days |
|---|---|---|---|
| 12-21-2018 | 07-17-2019 | accrue | 208 |

  Accrued Pgm Days...: 208
  Carry Over Pgm Days: 0
  Time Credit Factor.: 10
  Time Credits.......: 60

--------------------------------------------------------------------------------

| Start | Stop | Pgm Status | Pgm Days |
|---|---|---|---|
| 07-17-2019 | 10-12-2024 | accrue | 1914 |

  Accrued Pgm Days...: 1914
  Carry Over Pgm Days: 28
  Time Credit Factor.: 15
  Time Credits.......: 960

--- FSA Assessment(s) ----------------------------------------------------------

| # | Start | Stop | Assignment | Asn Start | Factor |
|---|---|---|---|---|---|
| 001 | 12-21-2018 | 01-18-2019 | R-LW | 04-28-2021 11:36 | 10 |
| 002 | 01-18-2019 | 07-17-2019 | R-LW | 04-28-2021 11:36 | 10 |
| 003 | 07-17-2019 | 01-13-2020 | R-LW | 04-28-2021 11:36 | 15 |
| 004 | 01-13-2020 | 07-11-2020 | R-LW | 04-28-2021 11:36 | 15 |
| 005 | 07-11-2020 | 01-07-2021 | R-LW | 04-28-2021 11:36 | 15 |
| 006 | 01-07-2021 | 07-06-2021 | R-LW | 04-28-2021 11:36 | 15 |
| 007 | 07-06-2021 | 01-02-2022 | R-LW | 04-28-2021 11:36 | 15 |
| 008 | 01-02-2022 | 07-01-2022 | R-LW | 11-04-2021 08:09 | 15 |
| 009 | 07-01-2022 | 12-28-2022 | R-LW | 04-21-2022 09:00 | 15 |
| 010 | 12-28-2022 | 06-26-2023 | R-LW | 10-06-2022 07:10 | 15 |
| 011 | 06-26-2023 | 12-23-2023 | R-LW | 03-30-2023 09:06 | 15 |
| 012 | 12-23-2023 | 06-20-2024 | R-LW | 09-21-2023 07:39 | 15 |
| 013 | 06-20-2024 | 12-17-2024 | R-LW | 03-14-2024 06:15 | 15 |

**FSA Time Credit Assessment**

Register Number:51349-039, Last Name:JUNOD

**U.S. DEPARTMENT OF JUSTICE**                     **FEDERAL BUREAU OF PRISONS**

--- Best Case Scenario - Conditional Pre-release Planning & Preparation Only ------------------
All conditional days and conditional dates below are the individual's best case scenario given the individual's FSA/FTC status and best case SCA days as of 10-12-2024. These dates can change if there are changes to one or more of the following: the individuals FSA risk, FSA opt-in/opt-out status, or best case SCA days.

SCA DAYS ARE NOT GUARANTEED AND REQUIRE AN INDIVIDUALIZED ASSESSMENT! THEREFORE, IF A DEFAULT OF 365 DAYS IS REFLECTED, THIS DATE IS SUBJECT TO CHANGE BASED ON THE REQUIRED FIVE-FACTOR REVIEW UNDER 18 USC SEC. 3621(B). AN INDIVIDUAL WHO HAS PENDING CHARGES/DETAINERS ARE NOT ELIGIBLE FOR SCA TIME. THE FIVE-FACTOR REVIEW INVOLVES THE FOLLOWING: (1)THE RESOURCES OF THE FACILITY CONTEMPLATED; (2) THE NATURE AND CIRCUMSTANCES OF THE OFFENSE; (3) THE HISTORY AND CHARACTERISTICS OF THE PRISONER; (4) ANY STATEMENT BY THE COURT THAT IMPOSED THE SENTENCE: (a)CONCERNING THE PURPOSES FOR WHICH THE SENTENCE TO IMPRISONMENT WAS DETERMINED TO BE WARRANTED; OR (b) RECOMMENDING A TYPE OF PENAL OR CORRECTIONAL FACILITY AS APPROPRIATE; AND (5) ANY PERTINENT POLICY STATEMENT ISSUED BY THE U.S. SENTENCING COMMISSION.
---

Projected Release Date: 05-29-2028
Projected Release Method: GCT REL
FSA Projected Release Date: 05-30-2027
FSA Projected Release Method: FSA REL
FSA Conditional Release Date: 05-30-2027
SCA Conditional Placement Days: 365*
SCA Conditional Placement Date: 05-30-2026*
FSA Conditional Placement Days: 745
FSA Conditional Placement Date: 05-15-2025
Conditional Transition To Community Date: 05-15-2024*
**\*Default SCA conditional placement days. This requires a five-factor review!**

EXHIBIT B

SCHEDULE OF FEES FOR CONSULAR SERVICES

| Item No. | Fee |
|---|---|
| **32.** * * * | |
| (e) Certain adoptee applicants for replacement Immigrant Visas as described in 22 CFR 42.71(b)(2) ..................................... | No Fee. |
| (f) Certain immigrant visa applicants previously refused pursuant to Proclamation 9645 or Proclamation 9983, as described in 22 CFR 42.71(b)(3) .................................................................................................................................................................. | No Fee. |
| **34.** * * * | |
| (a) Certain immigrant visa applicants previously refused solely pursuant to Proclamation 9645 or Proclamation 9983, as described in 22 CFR 42.71(b)(3) ................................................................................................................................................. | No Fee. |

* * * * *

## PART 42—VISAS: DOCUMENTATION OF IMMIGRANTS UNDER THE IMMIGRATION AND NATIONALITY ACT, AS AMENDED

■ 3. The authority citation for part 42 continues to read as follows:

**Authority:** 8 U.S.C. 1104 and 1182; Pub. L. 105–277, 112 Stat. 2681; Pub. L. 108–449, 118 Stat. 3469; The Convention on Protection of Children and Co-operation in Respect of Intercountry Adoption (done at the Hague, May 29, 1993), S. Treaty Doc. 105–51 (1998), 1870 U.N.T.S. 167 (Reg. No. 31922 (1993)); 42 U.S.C. 14901–14954 (Pub. L. 106–279, 114 Stat. 825); 8 U.S.C. 1101 (Pub. L. 111–287, 124 Stat. 3058); 8 U.S.C. 1154 (Pub. L. 109–162, 119 Stat. 2960); 8 U.S.C. 1201 (Pub. L. 114–70, 129 Stat. 561).

■ 4. Section 42.71 is amended by revising paragraph (b) to read as follows:

### § 42.71 Authority to issue visas; visa fees.

* * * * *

(b) *Immigrant visa fees—*(1) *Payment of fees.* The Secretary of State prescribes a fee for the processing of immigrant visa applications. Except as provided in paragraphs (b)(2) and (3) of this section, an individual registered for immigrant visa processing at a post designated for this purpose by the Deputy Assistant Secretary for Visa Services must pay the fee upon being notified that a visa is expected to become available in the near future, and upon being requested to obtain the supporting documentation needed to apply formally for a visa, in accordance with instructions received with such notification. The fee must be paid before an applicant at a post so designated will receive an appointment to appear and make application before a consular officer. Applicants at a post not yet so designated will pay the fee immediately prior to formal application for a visa. A fee collected for the processing of an immigrant visa application is refundable only if the principal officer of a post or the officer in charge of a consular section

determines that the application was not adjudicated as a result of action by the U.S. Government over which the alien had no control and for which the alien was not responsible, which precluded the applicant from benefitting from the processing, or as provided in paragraph (b)(2) of this section.

(2) *Waiver or refund of fees for replacement immigrant visas for adoptees.* The consular officer shall waive the application processing fee for a replacement immigrant visa or, upon request, refund such a fee where already paid, if the consular officer is satisfied that the alien, the alien's parent(s), or the alien's representative has established that:

(i) The prior immigrant visa was issued on or after March 27, 2013, to an alien who has been lawfully adopted, or who is coming to the United States to be adopted, by a United States citizen;

(ii) The alien was unable to use the original immigrant visa during the period of its validity as a direct result of extraordinary circumstances, including the denial of an exit permit; and

(iii) The inability to use the visa was attributable to factors beyond the control of the adopting parent or parents and of the alien.

(3) *Exemption from fees for immigrant visa applicants previously refused solely pursuant to Proclamation 9645 or Proclamation 9983.* An immigrant visa applicant shall be exempt from the application processing fee and the affidavit of support review fee, if the applicant was previously denied an immigrant visa on or between December 8, 2017, and January 19, 2020; the sole ground of ineligibility was based on Proclamation 9645 or 9983; and the applicant is applying again for an immigrant visa. This paragraph (b)(3) provides only for a one-time exemption of the applicable fees per applicant.

■ 5. Section 42.74 is amended by revising paragraph (a) to read as follows:

### § 42.74 Issuance of new, replacement, or duplicate visas.

(a) *New immigrant visa for a special immigrant under INA 101(a)(27)(A) and (B).* The consular officer may issue a new immigrant visa to a qualified alien entitled to status under INA 101(a)(27)(A) or (B), provided that:

(1) The alien establishes that the original visa has been lost, mutilated, or has expired; or that the alien will be unable to use it during the period of its validity; and

(2) The alien pays anew the application processing fees prescribed in the Schedule of Fees (22 CFR 22.1); and

(3) The consular officer ascertains whether the original issuing office knows of any reason why a new visa should not be issued.

* * * * *

Kevin E. Bryant,
*Deputy Director, Office of Directives Management, U.S. Department of State.*
[FR Doc. 2022–00829 Filed 1–18–22; 8:45 am]
**BILLING CODE 4710–06–P**

## DEPARTMENT OF JUSTICE

**Bureau of Prisons**

**28 CFR Parts 523 and 541**

**[BOP–1176P]**

**RIN 1120–AB76**

## FSA Time Credits

**AGENCY:** Bureau of Prisons, Justice.

**ACTION:** Final rule.

**SUMMARY:** This rule codifies the Bureau of Prisons' (Bureau or BOP) procedures regarding the earning and application of time credits as authorized by the First Step Act of 2018 (FSA), hereinafter referred to as "FSA Time Credits" or "Time Credits." The FSA provides that

JUNOD, ERIC   51349039

eligible inmates earn FSA Time Credits toward prerelease custody or early transfer to supervised release for successfully completing approved Evidence-Based Recidivism Reduction (EBRR) Programs or Productive Activities (PAs) assigned to each inmate based on the inmate's risk and needs assessment. Inmates eligible to apply Time Credits under the FSA include individuals sentenced under the U.S. Code. As required by the FSA, an inmate cannot earn FSA Time Credits if that inmate is serving a sentence for a disqualifying offense or has a disqualifying prior conviction. However, such inmates may still earn other benefits for successfully completing recidivism reduction programming, such as increased privileges (commissary, visiting, and telephone) for participation in EBRR Programs or PAs, as authorized by the Bureau.

**DATES:** This rule is effective on January 19, 2022.

**FOR FURTHER INFORMATION CONTACT:** Sarah Qureshi, Office of General Counsel, Bureau of Prisons, phone (202) 353–8248.

**SUPPLEMENTARY INFORMATION:** This rule codifies the Bureau of Prisons' (Bureau) procedures regarding First Step Act (FSA) Time Credits, as authorized by 18 U.S.C. 3632(d)(4) and Section 101 of the First Step Act of 2018 (Pub. L. 115–391, December 21, 2018, 132 Stat 5194) (FSA). The FSA provides that an eligible inmate in Bureau custody who successfully participates in EBRR Programs or PAs recommended based on the inmate's risk and needs assessment will earn FSA Time Credits, to be applied toward prerelease custody (*i.e.*, transfer to a Residential Reentry Center (RRC) or home confinement for service of a portion of the inmate's sentence) or transfer to supervised release (*i.e.*, early satisfaction of the inmate's term of imprisonment) under 18 U.S.C. 3624(g).

The proposed rule on this subject was published on November 25, 2020 (85 FR 75268). The public comment period ended on January 25, 2021. The Bureau received over two hundred and fifty responses to the publication of the proposed rule, but cannot generate a definite number of comments, as a significant portion of responses were from inmates in Bureau facilities and their family members requesting that FSA Time Credits be applied to the terms of imprisonment of particular inmates, rather than specific comments or questions regarding the proposed regulations as published.

Staff at Bureau facilities have been instructed to address specific questions regarding application of FSA Time Credits to particular inmates with those individual inmates, and we encourage those with questions regarding particular inmates to address those questions to staff at facilities where those inmates are housed, or to the regional offices with oversight for those facilities. A list of Bureau of Prisons Regional Offices can be found on the Bureau website: *https://www.bop.gov/about/facilities/offices.jsp?o=4.*

The Bureau also received a large number of comments on the proposed regulations which repeated certain common themes and issues. We have therefore consolidated the issues raised into representative excerpts from selected commenters, and address these issues below.

Additionally, on October 18, 2021, the Bureau published a document reopening the comment period of the proposed rulemaking until November 17, 2021, to solicit public comment on the limited issue of whether DC Code offenders in Bureau of Prisons custody are eligible to apply Time Credits under 18 U.S.C. 3632(d)(4), as added by the FSA. 86 FR 57612. We received thirty submissions during the reopened comment period with regard to that issue, which we discuss further below.

*COMMENT: The Bureau's definition of a "day" as one eight-hour-period of a successfully completed EBRR Program or PA is incorrect, unworkable, and/or contrary to congressional intent.*

The FSA provides that "[a] prisoner shall earn 10 days of time credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities." 18 U.S.C. 3632(d)(4)(A)(i). An inmate determined to be at a "minimum or low risk for recidivating" who, "over 2 consecutive assessments, has not increased their risk of recidivism, shall earn an additional 5 days of time credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities." 18 U.S.C. 3632(d)(4)(A)(ii). The statute does not expressly define what constitutes a "day" of successful participation. In the proposed rule, the Bureau defined it as "one eight-hour period of participation in an EBRR Program or PA that an eligible inmate successfully completes."

More than 150 commenters raised concerns with the Bureau's definition. For example, Senator Sheldon Whitehouse (D–RI) and Senator John Cornyn (R–TX) commented as follows:

The proposed rule's definition of a "day" of program participation does not adequately reward engagement with [EBRR programs] and PAs consistent with the First Step Act. . . . Because BOP programs do not run for eight hours per day, the proposed rule would require individuals to attend an EBRR or PA for several calendar days before they earned a full "day" of time credit. . . It was not our intent as drafters of the legislation that BOP define a "day" in this way. Nor did Congress ever consider it. . . . The proposed rule's narrow definition of a "day" does not adequately incentivize program participation and reduce recidivism as intended by the First Step Act.

Congressman Hakeem Jeffries (D–NY) echoed the Senators' sentiments, stating:

[D]efining a day as eight hours of participation does not appear to be a good faith attempt to honor congressional intent. A day of successful participation is clearly a day on which a prisoner has successfully participated in a program or productive activity. BOP['s] definition of [a] day would dramatically reduce the amount of time credits an individual can earn.

*RESPONSE:* After carefully considering the comments received, the Bureau agrees that a change is warranted. The proposed definition of a day of successful participation was inconsistent with the goals of the FSA and would have been logistically burdensome to calculate and administer. The Bureau is thus adopting a simpler FSA Time Credits program award model that will more fully encourage and reward participation in evidence-based recidivism reduction programs and productive activities.

In enacting the FSA, Congress made clear that Time Credits should be broadly applicable to a wide range of inmates for a broad range of activities to maximize their opportunities to reduce recidivism. The proposed definition, however, would have meant that inmates could successfully do everything asked of them as part of their recommended programming for multiple days (*e.g.*, two hours each day for four days), but be credited for only one day of successful participation.

In addition, the proposed definition would have required Bureau staff to not only track inmate participation in recommended programming, but also break down participation time into individual hours of work, and then aggregate time spent completing certain programming with other time spent completing other programming. This approach would have varied the earning of Time Credits by program factors such as intensity, length, and duration that could have been confusing to inmates, burdensome for staff to administer, and inconsistent with the general goal of awarding Time Credits in a consistent manner to inmates who are participating in the full range of programming

JUNOD, ERIC 51349039

recommended to them based on the results of their risk and needs assessments.

The final rule adopts a more straightforward and more administratively manageable approach that is consistent with the FSA's goal of promoting successful participation in EBRR Programs and PAs. For every thirty-day period that an eligible inmate successfully participates in EBRR Programs or PAs recommended based on the inmate's risk and needs assessment, the inmate will earn ten days of FSA Time Credits. If the inmate is determined to be at a minimum or low risk for recidivating and can maintain that risk level for the most recent two consecutive risk and needs assessments, that inmate may earn an additional five days of FSA Time Credits per thirty-day period.

An eligible inmate must successfully participate in programs and activities that the Bureau recommends based on an individualized risk and needs assessment to earn Time Credits. An inmate will not be considered to be successfully participating if that inmate refuses to participate in or otherwise violates conditions, rules, or requirements of EBRR programs or PAs recommended based on the inmate's risk and needs assessment. However, temporary interruptions in participation that are unrelated to an inmate's refusal to participate or other violation of programming requirements, or that are authorized by the Bureau, such when a recommended program or activity is unavailable or at full enrollment, will not affect the inmate's ability to earn Time Credits.

If an eligible inmate refuses to participate in the recommended program or activity, engages in misconduct that results in removal from the program or activity through placement in restrictive housing, or disrupts or fails to follow the conditions, parameters, or rules of the program or activity, accrual of Time Credits is paused until the inmate complies with programming and completes the disciplinary sanction. This methodology is intended to guide inmates back to the appropriate pro-social goals of programming and act as a deterrent for future misconduct, giving inmates a direct incentive to maintain clear conduct (behavior clear of inmate disciplinary infractions under 28 CFR part 541).

By clarifying the method for awarding Time Credits in this manner to ensure it furthers Congressional intent of the statute, the Bureau hopes to increase the amount of FSA Time Credits that may be awarded to eligible inmates.

*COMMENT: FSA Time Credits should be earned for programs successfully completed on or after December 21, 2018, the date of the enactment of the First Step Act, instead of January 15, 2020, as indicated in the proposed rule.*

More than 150 commenters raised this issue, including Senator Sheldon Whitehouse (D–RI) and Senator John Cornyn (R–TX), who wrote:

The Act provides that "[a] prisoner may not earn time credits under this paragraph for an evidence-based recidivism reduction program that the prisoner successfully completed . . . prior to the date of enactment of this subchapter." 18 U.S.C. 3632(d)(4)(B). . . . The proposed rule, however, states that an individual may only earn time credits for programs "successfully completed on or after January 15, 2020"—more than a year after the date of enactment. Nor does the proposed rule explain why individuals are not eligible to earn time credits for programs completed between December 21, 2018 and January 15, 2020.

Congressman Hakeem Jeffries (D–NY) also commented on this issue, opining that the regulation's proposed start date for earning time credits of January 15, 2020, "serves no clear purpose and is inconsistent with the text of the First Step Act, which states that credit may not be earned for programs completed prior to the date of enactment of this subchapter, which was December 21, 2018."

*RESPONSE:* As the commenters correctly note, the FSA explicitly states that Time Credits may not be earned for participation in programming prior to the date of the FSA's enactment. The statute is silent, however, as to the specific date on which inmates should begin to earn Time Credits. Instead, the statute expressly contemplates a phased-in approach and sets specific timelines and benchmarks for implementation.[1] This phased-in approach is appropriate and warranted, given that the FSA has been the most impactful congressional action taken concerning the Bureau of Prisons in recent years, requiring major changes to existing systems and processes, the development of new systems, and

changes that apply to approximately 130,000 current inmates.

Under this phased-in approach, the Attorney General was required to develop and release the risk and needs assessment system within 210 days from the date the FSA was signed into law, December 21, 2018. The new risk and needs assessment tool, called the Prisoner Assessment Tool Targeting Estimated Risk and Needs (PATTERN), was subsequently released on July 19, 2019, in accordance with the FSA. Additional modifications of PATTERN occurred after feedback was received from external stakeholders and the FSA-established Independent Review Committee.

The FSA required that as part of the implementation period, within 180 days of the risk and needs assessment system's release date, the Bureau would conduct initial risk and needs assessments for the inmate population and begin expanding the EBRR Programs and PAs necessary to effectively implement the system.[2] The Bureau assigned an initial PATTERN risk level to each inmate by the statutory deadline of January 15, 2020. And, notably, the Bureau implemented the FSA's directive at 18 U.S.C. 3621(h)(2)(A), to assign inmates to EBRR Programs or PAs by January 15, 2022 (two years after the date by which the agency completed risk and needs assessments for all inmates) well before that date.

Because the FSA contemplates a phase-in period during which the risk and needs assessment system could be developed, and because the FSA is silent regarding a specific date when eligible inmates must begin earning Time Credits, the Bureau exercised its discretion and adopted the position in the proposed rule that it would be reasonable for the Bureau to begin allowing inmates eligible under the FSA to earn FSA Time Credits *after* the risk and needs assessment and relevant programming were established, *i.e.,* on January 15, 2020, the date on which initial evaluations under the new risk and needs assessment system were completed. However, in light of the comments submitted, the Bureau acknowledges that because the FSA is silent regarding a specific date when eligible inmates must begin earning Time Credits, yet explicitly prohibits the earning of Time Credits for participation prior to the date of enactment, the statute could also be interpreted to allow for eligible inmates to earn Time Credits as of December 21, 2018, the date of enactment of the FSA.

---

[1] *See* 18 U.S.C. 3621(h)(1)(C), referring to the "risk and needs assessment tools necessary to effectively implement the System over time," and sec. 3621(h)(2)(A), requiring that EBRR Programs and PAs be provided "before the date that is 2 years after the date on which the Bureau of Prisons completes a risk and needs assessment for each prisoner. . . ." The Bureau completed risk and needs assessments for every inmate in Bureau custody on January 15, 2020, and, therefore, as indicated by the FSA, had until January 15, 2022, to ensure that EBRR Programs and PAs are provided to eligible inmates in Bureau custody. The Bureau was already providing those programs and activities to eligible inmates well in advance of that date.

[2] *See* 18 U.S.C. 3621(h)(1).

JUNOD, ERIC  51349039

The case law on this issue is mixed, but some courts have concluded that this reading is in fact the better one. With regard to participation in programming completed after the date of the FSA's enactment, but before completion of all inmate risk and needs assessments on January 15, 2020, some courts have held that eligible inmates should be awarded FSA Time Credits in addition to the pre-FSA incentives already offered by the Bureau. Courts in the Districts of New Jersey and Oregon have directed the Bureau to award Time Credits under the FSA for the successful completion of programs and activities occurring before January 15, 2020, but on or after December 21, 2018, the FSA's date of enactment. *See, e.g., Cazares v. Hendrix,* 20–cv–2019 (D. Or. Nov. 9, 2021); *Goodman v. Ortiz,* 2020 WL 5015613, at *6 (D.N.J., Aug. 25, 2020) (holding inmates are currently entitled to FSA Time Credits that have been properly earned); *Hare v. Ortiz,* 2021 WL 391280, at *7 (D.N.J. Feb. 4, 2021) (limiting award of Time Credits to those earned for programs completed on or after the date of enactment of the FSA); *Gallo v. Ortiz,* Civ. No. 20–16416 (D.N.J., filed Feb. 16, 2021) (District Court required the Bureau to calculate Time Credits based on 2018 date).[3] Awarding Time Credits as of the date of enactment may also be more consistent with the FSA's goals of reducing recidivism through participation in programming and activities, and allowing inmates to work towards early release. From a fairness perspective, the Bureau also acknowledges that an inmate who has been consistently participating in programming, such as working to obtain his or her GED while the FSA was in effect, between December 21, 2018 (the date of the

enactment of the FSA), and January 15, 2020 (the date risk and needs assessments were completed on all Bureau inmates), should be rewarded for that effort.

While the Bureau continues to consider the FSA amenable to the interpretation reflected in the proposed rule, it acknowledges that the statute is ambiguous, and in light of the FSA's purposes and fairness considerations, it exercises its discretion to adopt the reading urged by the majority of commenters. Therefore, the Bureau amends this final rule to allow inmates eligible under the First Step Act to receive retroactive Time Credits for programming and activities they participated in starting on December 21, 2018, the date of the FSA's enactment. In determining how to award FSA Time Credits during the period before all individualized risk and needs assessments had been completed, the Bureau faces administrative challenges. Consistent with the phased-in approach contemplated by the FSA, the Bureau did not have mechanisms in place to methodically track participation in EBRRs and PAs until January 15, 2020, because comprehensive uniform tracking codes did not exist. In addition, it was not until that date that the Bureau had completed individualized risk and needs assessments for every inmate—and thus had a basis to conclude that there was an evidence-based reason to assign a particular program to, or recommend particular activities for, an inmate in order to reduce a particular inmate's risk of recidivism. Thus, in many instances, inmates were participating in programs for reasons other than addressing a criminogenic need.

Due to these administrative difficulties, for inmates participating in programming after the date of the FSA's enactment, but before the date that Bureau had completed all risk and needs assessments (December 18, 2018, to January 14, 2020), it is not feasible for the Bureau to connect individual inmate participation in programming to individualized risk and needs assessments, since the risk and needs assessment tool did not exist until well after the date of the FSA's enactment. Instead, for inmate participation in programming during this period of time, the Bureau will exercise its discretion to award FSA Time Credits to inmates otherwise deemed eligible under the First Step Act by applying the same criteria as that applied to inmate participation in authorized EBRR programs or PAs recommended based on a risk and needs assessment after January 2020 to determine the inmate's

retroactive Time Credit balance. Eligible inmates will be afforded a presumption of participation for the period between December 21, 2018, and January 14, 2020 and be awarded Time Credits accordingly. Inmates will not receive credit for any period in which they were in a special housing unit, in a designation status outside the institution, temporarily transferred to the custody of another Federal or non-Federal government agency, in mental health/psychiatric holds (either court-ordered mental health/psychiatric evaluations or situations in which mental health or psychiatric evaluation or treatment require an inmate to be designated outside or away from the inmate's "home" facility within the Bureau), or for refusing mandatory programming, as further explained below.

*COMMENT: There are no safeguards in the risk and needs assessment system to prevent racial discrimination or racial disparities.*

Several commenters were concerned about the potential for racial and ethnic biases or disparities in the risk and needs assessment tool used by the Bureau of Prisons.

*RESPONSE:* The Department of Justice issued the Risk and Needs Assessment System (RNAS) mandated by the First Step Act, known as PATTERN, on July 19, 2019. *See The First Step Act of 2018: Risk and Needs Assessment,* U.S. DEP'T OF JUSTICE: OFFICE OF THE ATTORNEY GENERAL, *https://www.bop.gov/ inmates/fsa/docs/the-first-step-act-of-2018-risk-and-needs-assessment-system.pdf* (July 2019). The Department's release of PATTERN was followed by a comment period during which the Department received approximately 200 comments and statements and held two listening sessions. On November 19, 2019, the Attorney General met with the Independent Review Committee (IRC) created by Section 107 of the FSA to discuss proposed changes to PATTERN, as required by 18 U.S.C. 3632.

The Attorney General then announced enhancements to PATTERN in a document entitled *The First Step Act of 2018: Risk and Needs Assessment System—UPDATE, https:// www.bop.gov/inmates/fsa/docs/the-first-step-act-of-2018-risk-and-needs-assessment-system-updated.pdf* (January 2020) (2020 Update). In this 2020 Update, and in response to concerns arising from potential racial disparities, the Department instituted several recommended changes to the tool. Later, in 2021, the Department also implemented a more standardized

---

[3] Most courts that have analyzed this issue, however, have found it reasonable for the Bureau to begin awarding Time Credits for successful completion on or after January 15, 2020, as opposed to holding that inmates are entitled to FSA Time Credits for successful completion of EBRR Programs and PAs occurring before that date but on or after December 21, 2018. *See, e.g., Cohen v. United States,* No. 20–cv–10833, 2021 WL 1549917, at *6 (S.D.N.Y. Apr. 20, 2021) ("[T]he statute does not require the BOP to begin awarding ETCs [earned time credits] during the phase-in period."); *Kennedy-Robey v. Warden, FCI Pekin,* No. 20–cv–1371 (C.D. Ill. Mar. 2, 2021) (ECF No. 14) ("Not only is the BOP's decision to delay awarding credits permitted under the statute, the BOP has legitimate reasons for desiring to do so."); *Llewlyn v. Johns,* No. 5:20-cv-77, 2021 WL 535863 (S.D. Ga. Jan. 5, 2021); *Herring v. Joseph,* No. 4:20–CV–249, 2020 WL 3642708, at *1 (N.D. Fla. July 6, 2020); *Holt v. Warden,* 4:20–CV–04064–RAL, (D.S.D. May. 13, 2021; *Fleming v. Joseph,* No. 3:20CV5.990–LC–HTC, 2021 WL 166936l (N.D. Fla. Apr. 7, 2021) (report and recommendation). *See also Bowling v. Hudgins,* 2020 WL 1917490 (N.D. Va. Apr. 20, 2020); *Allen v. Hendrix,* 2020 WL 890396 (E.D. Ark. Feb. 24, 2020).

JUNOD, ERIC 51349039

process for inputting scores into the risk and needs system, and the Bureau will continue to ensure that necessary precautions are taken to ensure consistent, objective application for all inmates in accordance with the published schema.

The *2021 Annual Review and Revalidation of the First Step Act Risk Assessment Tool* report confirmed the predictive and dynamic validity of PATTERN, but expressed the concern that differences in race and ethnicity might affect predictions of risk for recidivism. The Justice Department takes seriously its responsibility under the First Step Act to annually "review, validate, and release publicly on the Department of Justice website the risk and needs assessment system," and ". . . to identify any unwarranted disparities, including disparities among similarly classified prisoners of different demographic groups . . ." 18 U.S.C. 3631(b)(4)(E). The Department will continue to meet this mandate, to rigorously evaluate any risk assessment tool, including through the use of outside experts, and to take all steps possible to address and mitigate against racial bias or other disparities.

As part of that compliance, the Department will publish annually (1) for each disqualifying offense, data on how many individuals from each racial and/or ethnic group were ineligible to earn Time Credits; (2) for each disqualifying prior federal conviction, data on how many individuals from each racial and/or ethnic group were ineligible to earn Time Credits; (3) for all other disqualifying prior convictions, data on how many individuals from each racial and/or ethnic group.were ineligible to earn Time Credits; (4) data on how many individuals from each racial and/or ethnic group were eligible to earn Time Credits; and (5) how many individuals from each racial and/or ethnic received risk and needs assessment score classifications of "high," "medium," "low," and "minimum" based on their most recent assessment.

*COMMENT: The Bureau does not have the resources to implement the FSA Time Credits program appropriately.*

Several commenters were concerned about the Bureau's ability to implement the FSA Time Credits program. One commenter, for example, stated that "the average course that is offered by BOP is not listed on the list for reentry courses, some of which are college/ correspondence courses that inmates have to pay for out of pocket. As for the courses that are listed, they are not even offered at this time because inmates are

the teachers of them, and COVID does not allow inmates to teach them at this time. Many inmates are returning home now, not having had any reentry courses—not to their own fault." Other commenters mentioned long waitlists and other scarcity of resource issues.

*RESPONSE:* The Bureau recognizes the significant impact that the FSA will have on inmate programming, and notes that additional appropriated funding has been directed toward FSA implementation. These additional resources will be used to add to existing programs and meet the FSA's direction that the Bureau encourage and increase inmate programming participation.

Before the enactment of the FSA, the Bureau already offered a wide variety of programs and activities designed to prepare inmates for release, educate them, and provide them with substance abuse disorder and mental health treatment. The Bureau has always endeavored to focus on increasing the breadth and depth of its programming for inmates and build greater capacity for inmate participation in programming, and the FSA provides further statutory support for that mission. To that end, the Bureau has asked, and will continue to ask, Congress to authorize funding and staffing for those purposes, and will endeavor to fill staff positions as necessary to increase and enhance inmate programming.

In *The First Step Act of 2018: Risk and Needs Assessment System— UPDATE,* U.S. DEP'T OF JUSTICE: OFFICE OF THE ATTORNEY GENERAL, *https://www.bop.gov/ inmates/fsa/docs/the-first-step-act-of-2018-risk-and-needs-assessment-system-updated.pdf* (January 2020) (2020 Update), the Department indicated that it had received feedback expressing concerns about the Bureau's programming capacity. *Id.* at 18. The issue raised by this feedback to the Department is substantially similar to concerns raised by the commenters on the Bureau's proposed rule.

In response to the feedback discussed in this 2020 Update, the Department described the waitlist process for inmate programming, indicating that that process is meant to ensure that inmates are "enrolled in needed courses at the appropriate times in their incarceration," and that "case management and programming staff monitor these lists based on inmate need and release date/plans, to ensure relevant programs are completed in appropriate timeframes." *Id.* The Department also described the ongoing expansion of Federal Prison Industries and the Resolve Program (providing

trauma treatment). However, the Department also noted:

As part of the FSA implementation, the BOP is assigning codes to approved evidence-based recidivism reduction programs and productive activities to enable tracking and monitoring of their capacity and use. BOP will also begin assigning inmates to specific programs to address identified needs, which will allow it to further examine inmate interest and program capacity. Based upon these changes, BOP can expand or contract capacity consistent with the inmate needs and interests.

*Id.* The Department also noted in the 2020 Update that the Bureau had "already begun expanding programs and hiring staff to deliver" further necessary programming, and that although the FSA, issued in 2018, had "not come with appropriated funds in [fiscal year] FY 2019 . . . BOP had taken the initiative to adjust funding within its budget to cover a variety of targeted FSA activities." Further, for FY 2020, approximately $116 million was authorized to allow the Bureau to expand evidence-based reentry programs, capacity for prerelease custody, medication-assisted treatment (MAT) for opioid use disorder nationwide, information technology services for inmates, and evaluation of programs and services. *Id.* at 21–22.

Additionally, in the 2020 Update, the Department noted that to facilitate implementation of the FSA, the Bureau had increased staffing at female institutions and enhanced male and female trauma treatment and vocational training offerings. The Bureau also implemented a variety of hiring strategies to address staffing shortfalls, and continues to do so. *Id.* at 24. Therefore, while the Bureau recognizes that resources have been strained, future funding allotments will enhance the Bureau's course offerings and serve to bolster the Bureau's resources, improving its ability to carry out the FSA Time Credits program across all Bureau facilities.

*COMMENT: FSA Time Credits should be awarded for participation in UNICOR, online or correspondence college courses, religious services, more time for RDAP, and other programs and activities.*

Several commenters suggested that the list of EBRR Programs and PAs should be expanded to include participation in, or a greater amount of Time Credits allowable for participation in, UNICOR and prison jobs, online or correspondence courses (including college courses), religious services, the Residential Drug Abuse Treatment Program (RDAP), and a variety of other programs, courses, and activities.

JUNOD, ERIC 51349039

For instance, one commenter indicated that while the requirement to successfully complete a program before earning Time Credits "may make sense for educational classes, certificate-based programs, or fixed length productive activities, it should not apply to prison jobs that would require ongoing accumulation of Time Credits. A prison job is not a 'program to complete,' has no set duration, and its success is based on continued employment and supervisor evaluations."

Another commenter suggested that those "participating in the Residential Drug[] Abuse Program (RDAP), should receive (16) program hours per day, 2 eight-hour program days for 1 proposed day, . . . [because] RDAP participants 'live' in a therapeutic community."

Additionally, Senator Sheldon Whitehouse (D–RI) and Senator John Cornyn (R–TX) commented as follows:

As BOP finalizes and implements its proposed rule, it should ensure that individuals are assigned to categories of programs that meet their needs, rather than specific programs, to allow for maximum participation in credit-earning EBRRs and PAs. . . . Each program at a facility should be appropriately categorized, including faith-based programs. Such flexibility will ensure that individuals can freely choose to participate or not participate in faith-based options. It is also critical to allow for greater program access as BOP expands its offerings, as some programs have limited capacity or may not be offered at particular facilities.

*RESPONSE:* The Bureau agrees with these commenters, and has structured its programs and work assignments to promote participation and flexibility. New funding allotments will enhance the Bureau's course offerings, largely by permitting it to increase capacity through hiring additional staff, and will also serve to bolster the Bureau's resources, thereby improving its ability to carry out the FSA Time Credits program. The Bureau began to enhance programming immediately after the FSA's enactment, using then-current appropriations from FY 2019 not allotted specifically for FSA implementation, and continued to grow its programming offerings with budget allotments as authorized from FY 2020 appropriations.

In *The Attorney General's First Step Act Section 3634 Annual Report*, U.S. DEP'T OF JUSTICE: OFFICE OF THE ATTORNEY GENERAL, *https://www.bop.gov/inmates/fsa/docs/20201221_fsa_section_3634_report.pdf* (December 2020) (2020 Annual Report), the Bureau established a review process to consider externally submitted programs for potential inclusion on the approved EBRR Program/PA list. *Id.* at

17. The Bureau currently engages in partnerships with external organizations to recruit community volunteers to assist with inmate reentry and educational programs. Consistent with the goal of supporting and expanding volunteer activities at all institutions, on June 25, 2019, the Bureau provided guidance to all Wardens about the importance and use of partnerships under the FSA. Specifically, the Assistant Directors for the Office of General Counsel and Reentry Services Divisions issued guidance on collaboration with outside organizations pursuant to the FSA. This memorandum provided information on the FSA's statutory requirements, the Bureau process for establishing partnerships, equitable treatment of similar organizations, and tracking of partnerships.

On September 19, 2019, voluntary partnerships were in place at all 122 Bureau institutions. During FY 2019, 5,939 individuals volunteered 110,489 hours at various institutions. During FY 2020 (as of September 10, 2020), 5,978 volunteers and contractors had provided 157,752 hours at various institutions. The increase in volunteer hours can, in part, be attributed to staff efforts to increase partnerships pre-COVID–19, and changes made to the Bureau volunteer tracking system. *Id.* at 37.

In 2020, the Bureau created unique identifier codes for every Bureau program. These codes allow Bureau to track inmates' program enrollment, participation, and completion. This information can then be compared to needs assessment information and used as a method for assessing capacity. Unfortunately, because of the global pandemic, the Bureau has not been able to program as it would under normal conditions.

The Bureau assesses 12 broad need areas plus dyslexia, and programs are matched to each of these needs. As normal operations resume, the Bureau will be able to accurately track whether inmates sign up for the programs that match their needs, and whether the programs are offered with enough capacity that inmates are able to complete them at the appropriate times during their sentences. While the Bureau's current list of over 70 EBRR Programs and PAs addresses most areas of need, some improvements have been made even during the pandemic. For example, the Bureau created better quality and more standardized materials that provide more consistent program delivery. Additionally, a more intensive program addressing criminal cognition is in development to account for this

highly prevalent need in Bureau facilities. *Id.* at 19–20.

Also, several programs and activities mentioned by the commenters as items that should be included in the list of approved programs are, in fact, already on the list. *The First Step Act Approved Programs Guide*, available on the Bureau's website at *https://www.bop.gov/inmates/fsa/docs/2021_fsa_program_guide.pdf* (Programs Guide), contains a program description, institution locations, needs addressed by each program offered, and the department responsible for program delivery (*e.g.*, Education, Psychology).

The Programs Guide indicates that offered programs and activities "will vary based on the needs of the sentenced population" at a given location. This helps to explain, in part, why some programs and activities may not be available at all facilities. However, as the Bureau continues to expand its offerings, the Programs Guide continues to expand, and will be updated annually.

With regard to several programs and activities specifically mentioned by commenters:

*UNICOR:* Employment in Federal Prison Industries (FPI, also known by its trade name, UNICOR) is included in the Programs Guide as an EBRR Program.

*RDAP:* The Residential Drug Abuse Treatment Program (RDAP), is included in the Program Guide as an EBRR Program.

*Online or correspondence college courses:* The Programs Guide includes Post-Secondary Education programming, and explains that "[c]ollege level classes are provided by credentialed instructors from the community who deliver coursework leading to the Associates or Bachelors degree," and that "[s]pecific prerequisites for each program are determined by the school providing the service." *See Programs Guide* at 23. This program, delivered by Education staff or appropriately credentialed contractors, allows for online or correspondence college courses, as authorized and credentialed by the Bureau's Education staff.

*Religious services and programming:* The Programs Guide describes several faith-based programs and activities currently available at all Bureau facilities, including the Threshold Program, a faith-based reentry program (*id.* at 32), and Embracing Interfaith Cooperation, a PA which fosters interfaith dialogue and understanding to counter religious discrimination and extremism (*id.* at 36).

Also, the Bureau's longstanding Life Connections Program (LCP), a

JUNOD, ERIC 51349039

residential, multi-faith-based reentry program open to inmates of all religious traditions and those with no faith affiliation, uses contract partners to provide religious services, while community volunteers serve as mentors to inmate participants. This program is available at six Bureau facilities. *See* 2020 Annual Report, *supra*, at 37–38.

As the Bureau's FSA implementation budget appropriations increase and necessary COVID–19 pandemic-related health and safety restrictions ease, the Bureau will continue its efforts to expand EBRR programming and PA offerings available at Bureau facilities for eligible inmates. Furthermore, as noted above, the Bureau has changed the proposed regulation to a more inclusive model, whereby FSA Time Credits may be earned if an eligible inmate is successfully participating in EBRR Programs and PAs recommended based upon his or her risk and needs assessment. Also, inmates will not be penalized if specifically recommended EBRR Programs or PAs are unavailable to them or at full enrollment at their facilities. As the Bureau continues to evaluate these and other types of programs and activities, the list of EBRR Programs and PAs for which inmates may earn FSA Time Credits will likewise increase.

*COMMENT: FSA Time Credits should be earned for successful participation, not only for successful completion.*

Many commenters opined that FSA Time Credits should be awarded on an ongoing basis, during *participation* in EBRR programming and PAs, instead of after successful *completion* of an EBRR Program or PA. One commenter wrote that

[b]y focusing only on completion, BOP diminishes the value of participation and weakens the incentive structure Congress enacted. Indeed, there are myriad situations where people would successfully participate in an approved program and—through no fault of their own—be prevented from, or delayed in, completing it. Transfers, program resource and staffing limitations, and facility movement restrictions all impact program completion, as do length of sentence, program availability, and waitlists. Individuals have no control over completion if, for example, their facility is locked down, or if programs are indefinitely suspended due to a pandemic. Congress created the earned time credit system to encourage personal responsibility. BOP's all-or-nothing rule that fails to acknowledge participation is inconsistent with this intent. BOP should revise the proposed rule to allow individuals who successfully participate in programming to earn time credits.

*RESPONSE: The Bureau agrees with these comments. As indicated previously, the Bureau is altering and expanding its method for awarding Time Credits.

The concern of the commenters regarding participation in programming echoes the Bureau's longstanding policy of encouraging inmate reentry programming and productive activities throughout each inmate's incarceration, which is consistent with the FSA's goal of attaining maximum recidivism reduction. The Bureau will continue to emphasize the need for full and successful participation in EBRR programs and PAs, as recommended for each inmate, to achieve the maximum award of FSA Time Credits to the maximum number of eligible inmates.

Toward that end, the Bureau has developed the simpler model which it now adopts for the FSA Time Credits program. Under this model, each eligible inmate earns Time Credits while participating in recommended EBRR Programs and PAs. Time Credits for successful participation are awarded at the end of each thirty-day period. By altering the scheme for awarding Time Credits in this manner, the Bureau hopes to increase the amount of FSA Time Credits that may be awarded to the maximum number of eligible inmates. Inmates must participate in all programs and activities that the Bureau recommends based on an individualized risk and needs assessment to be considered to have successfully participated in recommended EBRR Programs and PAs for purposes of earning Time Credits.

It is important to note, however, that temporary interruptions in participation that are unrelated to an inmate's refusal or other violation of programming requirements, such as the unavailability of a recommended program or activity or its full enrollment, or interruptions authorized by the Bureau, will not affect the inmate's ability to earn Time Credits. An inmate's ability to earn FSA Time Credits will be affected if the inmate refuses to participate in the recommended programming or productive activity, engages in misconduct that results in removal from the program or activity through placement in restrictive housing, or disrupts or fails to follow the conditions, parameters, or rules of the activity. In the event that the inmate is found to have committed any of these violations, accrual of Time Credits is paused until the inmate complies with programming conditions, parameters, or rules, or completes the disciplinary sanction.

For example, the Bureau may permit an inmate to continue earning FSA Time Credit if programming is briefly interrupted due to an instructor's illness, which results in the instructor canceling class for the day. Another possible example might be a brief interruption caused by an inmate requiring to be absent from programming for a day or two due to illness or medical treatment. In such circumstances, the Bureau may review whether or not the illness or medical treatment is attributable to factors over which the inmate may exercise control (possible drug overdose, injuries sustained while fighting, etc.), whether the conduct is a disciplinary offense, or whether it is excusable behavior and therefore may be authorized. The Bureau will strive to reach an equitable result when calculating time in program participation and circumstances both beyond and within the inmate's control.

Accordingly, unless the inmate formally declines recommended programming addressing his or her unique needs, or is not participating in any activities, the assumption is that the eligible inmates will be earning Time Credits and fully participating in recommended programming. The regulation indicates that accrual of Time Credits may be suspended in certain situations when the inmate is unable to participate in recommended programming, including, but not limited to, situations such as:

• Placement in a Special Housing Unit;

• Designation status outside the institution (*e.g.*, for extended medical placement in a hospital or outside institution, court appearances, an escorted trip, a furlough, etc.);

• Temporary transfer to the custody of another federal or non-federal government agency (*e.g.*, on state or federal writ, transfer to state custody for service of sentence, etc.);

• Placement in mental health/ psychiatric holds; or

• "Opting out" (choosing not to participate in the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment).

Inmates who decline to participate in a recommended voluntary EBRR or PA (*i.e.*, inmates that "opt out") will not be considered to be refusing a program assignment for the purposes of disciplinary prohibited act code violations, but will merely be excluded from benefits or privileges of FSA Time Credit Program participation. For example, declining to take a recommended anger management course will prevent an inmate from earning FSA Time Credits, but will not in itself constitute a disciplinary prohibited act code violation. Inmates that refuse a formal assignment,

JUNOD, ERIC 51349039

**2712**   **Federal Register** / Vol. 87, No. 12 / Wednesday, January 19, 2022 / Rules and Regulations

however, will also be held responsible for any attendant disciplinary prohibited act code violations, *e.g.*, failing to report to institution work detail.[4]

COMMENT: *FSA Time Credits should be applied to an inmate's transfer to supervised release (to shorten a term of imprisonment).*

Some commenters indicated that they were concerned that Time Credits would not, in fact, be applied to transfer to supervised release at all, but instead might only be applied to prerelease custody, noting that the proposed rule "does not address the procedures for determining whether an individual inmate will have FSA Time Credits applied toward prerelease custody, early transfer to supervised release, a combination of both, or neither; this proposed rule only addresses the procedures for earning, awarding, loss, and restoration of FSA Time Credits."

RESPONSE: As stated, under the FSA, an eligible inmate who successfully participates in an EBRR Program or PA recommended by staff based on the inmate's risk and needs assessment may earn FSA Time Credits to apply toward prerelease custody or transfer to supervised release. Eligible inmates may earn 10 days of Time Credits (and, if maintaining a low or minimum risk status, an additional 5 days of Time Credits) for every 30-day period of successful participation in EBRR Programs or PAs.

However, under the FSA (18 U.S.C. 3624(g)), even if earned, Time Credits may not be applied to prerelease custody until:

• The amount of earned Time Credits is equal to the remainder of the inmate's imposed term of imprisonment;

• The inmate has demonstrated a reduced risk of recidivism or maintained a minimum or low recidivism risk during his or her term of imprisonment;

• The remainder of the inmate's imposed term of imprisonment has been computed under applicable law (*e.g.*, Good Conduct Time Credit under 28 CFR part 523 have been applied, eligibility for early release consideration under Residential Drug Abuse Treatment Program regulations in 28 CFR part 550 has been evaluated, etc.); and

• The inmate has been determined to be at a minimum or low risk of recidivating based on his or her last two assessments, or has had a petition to be

transferred to prerelease custody approved by the warden.

Similar requirements exist under the FSA for application of earned Time Credits to transfer to supervised release. Time Credits may not be applied to transfer to supervised release under 18 U.S.C. 3624(g) unless:

• The amount of earned Time Credits is equal to the remainder of the inmate's imposed term of imprisonment;

• The inmate's sentence includes a period of supervised release to be served after his or her term of imprisonment;

• The inmate's latest risk and needs assessment shows that he or she is at a minimum or low risk of recidivating; and

• The application of Time Credits would not result in starting the period of supervised release more than 12 months before he or she would otherwise be eligible to do so (*i.e.*, any amount of earned Time Credits in excess of 12 months would be applied to prerelease custody).

See Nathan James, U.S. Congressional Research Service, The First Step Act of 2018: An Overview (2019), at 5–6.

The Bureau assures commenters that FSA Time Credits will be applied to early transfer to supervised release, as authorized by the FSA in 18 U.S.C. 3632(d)(4)(C) and 18 U.S.C. 3624(g). See 2020 Annual Report at 39–44. The Bureau intends to adhere to the parameters of the FSA to permit application of Time Credits toward transfer to supervised release pending development of policy, in individual cases as appropriate.

COMMENT: *Earning FSA Time Credits should continue in Residential Reentry Centers and/or while in home confinement.*

Many commenters raised an issue that was articulated by Senator Sheldon Whitehouse (D–RI) and Senator John Cornyn (R–TX) as follows:

The proposed rule also provides that "FSA Time Credits can only be earned while an inmate is in a Bureau facility, and will not be earned if an inmate is in a Residential Reentry Center or on home confinement." The proposed rule does not cite to any authority for this restriction, and this interpretation is not consistent with the goals of the First Step Act.

Allowing individuals to earn time credits while in RRCs is authorized by the First Step Act. The Act provides that "[t]ime credits earned . . . by prisoners who successfully participate in recidivism reduction programs or productive activities shall be applied toward time in prerelease custody or supervised release." It defines "prisoner" as "a person who has been sentenced to a term of imprisonment pursuant to a conviction for a Federal criminal offense, or a person in the custody of the Bureau of Prisons."

Because "[p]re-release inmates at an RRC remain in Federal custody while serving a sentence imposed by a U.S. District Court or DC Superior Court," they are "prisoners" for the purposes of the First Step Act. Nor does the First Step Act distinguish between "prisoners" who are serving their sentence in a BOP institution, in an RRC, or on home confinement in describing the time credit program. By its own terms, the statute allows BOP to award time credits to individuals incarcerated in an RRC toward time in supervised release.

Allowing individuals incarcerated in an RRC to earn time credits by participating in EBRRs would further the purposes of the First Step Act. RRCs offer substance abuse treatment and other programs similar to those offered in BOP institutions. There is no reason to believe that a program offered in an RRC will reduce recidivism any less than one offered to an individual in prison. In fact, such programs may be more effective, as individuals are close to release from custody and can begin putting lessons learned into practice as they transition home. BOP should revise the proposed rule to allow individuals to earn time credits while in an RRC.

Congressman Hakeem Jeffries (D–NY) also stated, "I see no reason to make individuals in Residential Reentry Centers (RRCs) or in home confinement ineligible to earn time credits. . . . Congress could have used a narrower definition or explicitly excluded certain categories of individuals based on where they serve their sentence, but it chose not to do so."

RESPONSE: After carefully considering the comments received, the Bureau agrees that inmates in prerelease custody—whether in a residential reentry center (RRC) or on home confinement—are eligible to earn FSA Time Credits under 18 U.S.C. 3632(d)(4)(A), which they could presumably apply, under 18 U.S.C. 3632(d)(4)(C), toward transfer to supervised release.

The practical effect of allowing eligible inmates to keep earning Time Credits while in prelease custody (RRCs) will likely be limited, however, for several reasons. First, the Bureau intends to transfer eligible inmates who satisfy the criteria in 3624(g) to supervised release to the extent practicable, rather than to prelease custody. The Bureau therefore anticipates that the total population of eligible inmates in RRCs or home confinement will be small.

Second, as a practical matter, programming and services for inmates in RRCs or home confinement will often be provided off-site or by a third-party provider, which makes tracking successful participation more difficult. For example, community-based substance use treatment programs referred to by the Senators in their

---

[4] *See* 28 CFR 541.3, Table 1—Prohibited Acts and Available Sanctions: Moderate Severity Level Prohibited Acts, code 306: "Refusing to work or to accept a program assignment."

JUNOD, ERIC   51349039

comments are not provided on-site at RRCs, but rather on an outpatient basis. The Bureau uses a comprehensive inmate information tracking system that is only accessible to Bureau staff. The Bureau's inmate information tracking system is not accessible to RRC staff, and therefore cannot track inmate programming activity when inmates are no longer in the custody of the Bureau of Prisons.

Third, unlike a prison facility, which is a self-contained unit under the Bureau's control and supervision that can provide Bureau-authorized, comparable, and approved programming to all housed inmates, the breadth of programming available at or through different RRCs, or in the communities where an inmate may be place in home confinement, could vary significantly and may not correspond directly to recommendations based on inmates' most recent risk and needs assessments.

Given these variables, the Bureau will work on a case-by-case basis with eligible inmates in RRCs to identify appropriate available programming for them to earn FSA Time Credits, and will determine how to best track participation as part of the Bureau's commitment to ensure the maximum number of FSA Time Credits may be awarded to the maximum number of eligible inmates. The Bureau will issue guidance on this topic to ensure consistency in implementation.

*COMMENT: All inmates should be eligible for FSA Time Credits without exclusions.*

Several commenters recommended that, as a general matter, any inmate willing to participate in the FSA Time Credit program should be eligible for FSA Time Credits. A few individual commenters suggested more specifically that inmates convicted of particular offenses (as described above) should be removed from the category of "ineligible prisoners," as described in 18 U.S.C. 3632(d)(4)(D), and should be permitted to earn FSA Time Credits for application toward prerelease custody or transfer to supervised release.

*RESPONSE:* As noted, 18 U.S.C. 3632(d)(4)(D) describes inmates that are "ineligible to receive time credits" under Subchapter D (the Risk and Needs Assessment System) if serving a term of imprisonment for conviction under any of the provisions listed therein. It is outside the Bureau's authority to alter the exclusions as stated in the FSA. Some commenters suggested that "non-violent" offenses be removed from the ineligibility exclusions, but did not specify which offenses listed might be considered "non-violent" or otherwise define that term. Regardless, the

statutory exclusions may only be amended by Congress.

*Specific offenses:* The FSA enumerates 68 offenses for which inmates who are serving terms of imprisonment are ineligible. Commenters raised several specific offenses. We note that under the FSA's list of 68 enumerated offenses, the following are included as ones for which inmates are ineligible if they are serving a term of imprisonment upon conviction:

• 18 U.S.C. 2250, relating to failure to register as a sex offender (*see* 18 U.S.C. 3632(d)(4)(D)(xxxviii));
• 18 U.S.C. 2251, relating to the sexual exploitation of children (*see* 18 U.S.C. 3632(d)(4)(D)(xxxix));
• 18 U.S.C. 2251A, relating to the selling or buying of children (*see* 18 U.S.C. 3632(d)(4)(D)(xl));
• 18 U.S.C. 2252, relating to certain activities concerning material involving the sexual exploitation of minors (*see* 18 U.S.C. 3632(d)(4)(D)(xli));
• 18 U.S.C. 2252A, relating to certain activities involving material constituting or containing child pornography (*see* 18 U.S.C. 3632(d)(4)(D)(xlii));
• 18 U.S.C. 2260, relating to the production of sexually explicit depictions of a minor for importation into the United States (*see* 18 U.S.C. 3634(d)(4)(D)(xliii)).

*Prior convictions:* As stated in the preamble to the proposed rule, an inmate cannot earn FSA Time Credits if he or she has a disqualifying prior conviction as specified in 18 U.S.C. 3632(d)(4)(D). In the interest of clarifying the statement in the proposed rule, a "disqualifying prior conviction" would render an inmate ineligible to earn Time Credits under 18 U.S.C. 3632(d)(4)(D)(li) if the inmate:

1. Had a *prior conviction* for which he or she served a term of imprisonment of more than 1 year, for a Federal or State offense, by whatever designation and wherever committed, consisting of the following:

• Murder (as described in 18 U.S.C. 1111),
• voluntary manslaughter (as described in 18 U.S.C. 1112),
• assault with intent to commit murder (as described in 18 U.S.C. 113(a)),
• aggravated sexual abuse and sexual abuse (as described in 18 U.S.C. 2241 and 2242),
• abusive sexual contact (as described in 18 U.S.C. 2244(a)(1) and (a)(2)),
• kidnapping (as described in 18 U.S.C. chapter 55),
• carjacking (as described in 18 U.S.C. 2119),
• arson (as described in 18 U.S.C. 844(f)(3), (h), or (i)), or

• terrorism (as described in 18 U.S.C. chapter 113B);
*AND*
2. Is currently serving a term of imprisonment of more than 1 year for an offense described in 18 U.S.C. 3559(c)(2)(F), *i.e.,* a "serious violent felony," which means either—

(i) a Federal or State offense, by whatever designation and wherever committed, consisting of the following:

• Murder (as described in 18 U.S.C. 1111);
• manslaughter other than involuntary manslaughter (as described in 18 U.S.C. 1112);
• assault with intent to commit murder (as described in 18 U.S.C. 113(a));
• assault with intent to commit rape (as described in 18 U.S.C. 3559(c)(2)(A));
• aggravated sexual abuse and sexual abuse (as described in 18 U.S.C. 2241 and 2242);
• abusive sexual contact (as described in 18 U.S.C. 2244(a)(1) and (a)(2));
• kidnapping (as described in 18 U.S.C. 3559(c)(2)(E));
• aircraft piracy (as described in 49 U.S.C. 46502);
• robbery (as described in 18 U.S.C. 2111, 2113, or 2118);
• carjacking (as described in 18 U.S.C. 2119);
• extortion (as described in 18 U.S.C. 3559(c)(2)(C));
• arson (as described in 18 U.S.C. 3559(c)(2)(B));
• firearms use (as described in 18 U.S.C. 3559(c)(2)(D));
• firearms possession (as described in 18 U.S.C. 924(c)); 
• or attempt, conspiracy, or solicitation to commit any of the above offenses;
*OR*

(ii) any other offense punishable by a maximum term of imprisonment of 10 years or more—

• that has as an element the use, attempted use, or threatened use of physical force against the person of another or
• that, by its nature, involves a substantial risk that physical force against the person of another may be used in the course of committing the offense.

The Bureau is cognizant of the strict categorical analysis required by the Supreme Court in adjudicating whether an offense meets the elements or residual clause of 18 U.S.C. 3559. As such, the Bureau after consultation with the Department of Justice will ensure that its facilities receive updated information as to which federal and state offenses qualify or are the subject

JUNOD, ERIC  51349039

of litigation and that inmate records are updated to ensure maximum participation in credit-earning EBRRs.

*Deportable inmates:* As the FSA also indicates in 18 U.S.C. 3632(d)(4)(E), an inmate who is subject to a final order of removal under immigration laws as defined in 8 U.S.C. 1101(a)(17) may not have FSA Time Credits applied toward prerelease custody or early transfer to supervised release under 18 U.S.C. 3624(g).

Although the Bureau does not have the authority to award FSA Time Credits to inmates who are ineligible under the FSA, such inmates may still earn other benefits for successfully participating in the many other types of programming offered by the Bureau. Inmates ineligible for earning or applying FSA Time Credits may still receive incentives such as increased privileges (commissary, visiting, and telephone) for participation in EBRR Programs.

COMMENT: *Forfeiture penalties for earned Time Credits are too severe.*

Many commenters stated that the proposal to amend the Bureau's regulations on inmate discipline in 28 CFR part 541 to include forfeiture of FSA Time Credits as a disciplinary sanction was too severe. One commenter stated that:

The forfeiture rates would be too harsh on their own, but even more punitive when combined with other negative consequences for violations, including limits on future earning and use of time credits and would be disproportionately severe across all levels of prohibited acts... Moreover, forfeiture of earned time credits is not the only consequence an individual would suffer as the result of a prison infraction. An infraction could also negatively affect an individual's ability to earn and use time credits in the future by raising his risk score. . . .

Another commenter stated that

The proposal rule provides that to restore credits from prison rule violations, an individual must have "[c]lear conduct for at least four consecutive risk and needs assessments." . . . It could take at least 4 years to complete "at least four consecutive risk and needs assessments." Yet BOP provides no justification for requiring clear conduct for this long. Indeed, requiring an individual to remain infraction-free for at least 4 years is inconsistent with PATTERN. Under PATTERN, individuals who are infraction-free for 12 months or more receive no points related to the recency of an infraction. If PATTERN indicates those with infractions older than 12 months are no more risky than those with infractions older than 4 years, it is difficult to understand what justification BOP would have to require "clear conduct" for what could be at least 4 years.

RESPONSE: The Bureau agrees with these commenters, and has adjusted the proposed penalties related to FSA Time Credits accordingly. As stated in the proposed rule, FSA Time Credits may be lost through inmate discipline procedures described in 28 CFR part 541 only if an inmate violates the requirements or rules of an EBRR Program or PA. The FSA authorizes the Bureau to develop procedures for the reduction of FSA Time Credits for inmates under these circumstances. *See* 18 U.S.C. 3632(e). Opting out of a program will not result in the forfeiture of credits, unless failure to complete the program itself constitutes an infraction (*e.g.* failing to accept a mandatory work assignment).

The Bureau's proposed amendments to 28 CFR 541.3, Table 1 (Prohibited Acts and Available Sanctions), were intended to resemble the structure of current sanctions for loss of Good Conduct Time, which allow for forfeiture in escalating amounts depending on the severity level of the prohibited act committed. However, in light of the comments received, the Bureau alters the proposed forfeiture sanctions to more closely mirror the Good Conduct Time forfeiture sanctions, and accordingly decreases the amount of FSA Time Credits forfeiture sanctions for each prohibited act severity level offense by more than half.

Further, upon review, the Bureau agrees with commenters that it is inconsistent with the risk and needs assessment methodology to require clear conduct (behavior clear of inmate disciplinary infractions under 28 CFR part 541) for four consecutive assessments to permit restoration of forfeited Time Credits, and therefore alters the regulation to maintain consistency with the Department of Justice risk and needs assessment methodology—requiring clear conduct for *two* consecutive assessments (one year) as a condition of restoring forfeited Time Credits.

COMMENT: *The FSA should be applicable to DC Code Offenders.*

The Bureau reopened the comment period of the proposed rulemaking from October 18, 2021, until November 17, 2021, to solicit public comment on the limited issue of whether DC Code offenders in Bureau of Prisons custody are eligible to apply Time Credits under 18 U.S.C. 3632(d)(4), as added by the FSA. 86 FR 57612. We received thirty submissions during the reopened comment period. However, of those submissions, only eighteen were comments relating to the limited issue. Twelve submissions related to issues raised during the proposed rule comment period in 2020 or to specific circumstances of particular inmates in

Bureau facilities and their eligibility for FSA Time Credits, rather than the limited issue for which the document reopened the comment period. As we stated above with regard to submissions unrelated to the proposed rule, we encourage those with questions regarding particular inmates to address those questions to staff at facilities where those inmates are housed, or to the regional offices with oversight for those facilities.

RESPONSE: The October 18, 2021 document indicated that the proposed rule would have expressly excluded from time-credit eligibility any inmate serving a term of imprisonment only for an offense under the laws of the District of Columbia. The FSA, however, is ambiguous as to whether those with convictions under the DC Code are eligible to apply FSA Time Credits through their participation in EBRR programs or PAs.

Some comments pointed to features of the statute's text or history, suggesting that Congress intended DC Code offenders to be eligible to apply FSA Time Credits to their sentences. A comment from the Public Defender Service for the District of Columbia noted that the FSA defines "prisoner" as "a person who has been sentenced to a term of imprisonment pursuant to a conviction for a Federal criminal offense, or a person in the custody of the Bureau of Prisons." 18 U.S.C. 3635(4). That definition includes DC Code offenders, who the commenter pointed out are in Bureau custody under the National Capital Revitalization and Self Government Improvement Act of 1997, which requires that "any person who has been convicted of a felony offense pursuant to the District of Columbia Code . . . shall be subject to any law or regulation applicable to persons committed for violations of laws of the United States consistent with the sentence imposed." 111 Stat. 251 at 734; Public Law 105–33, Sec. 11021 (the "DC Revitalization Act").

A comment from Senator Cory Booker (D–NJ) noted that other unenacted bills addressing similar subjects that preceded the enactment of the FSA would have defined "prisoner" as a person sentenced for a federal offense. *See* Corrections and Recidivism Reduction Act of 2016, H.R. 759, 114th Cong. 8(4) (as introduced Feb. 5, 2015 sub nom. Recidivism Risk Reduction Act), *https://www.congress.gov/bill/ 114th-congress/house-bill/759/text/ih* (defining "prisoner" as "a person who has been sentenced to a term of imprisonment pursuant to a conviction for a Federal criminal offense"); the Sentencing Reform and Corrections Act

JUNOD, ERIC 51349039

of 2015, S. 2123, 114th Cong. 202(b)(8) (as introduced Oct. 1, 2015), *https:// www.congress.gov/bill/114th-congress/ senate-bill/2123/text/is* (defining "eligible prisoner" as "a prisoner serving a sentence of incarceration for conviction of a Federal offense," with exceptions for medical and security circumstances and sentences under one month).

But there are other statutory features suggesting Congress may not have intended the FSA Time Credit program to alter the time that DC Code offenders spend in Bureau facilities while serving sentences imposed by the District of Columbia. As noted, the DC Revitalization Act commits DC Code offenders to Bureau custody, but provides that these offenders "shall be subject to any law or regulation applicable to" U.S. Code offenders only insofar as those laws or regulations are "consistent with the sentence imposed." (DC Code section 24–101(b).) While this restriction does not appear to bar DC Code offenders from earning FSA Time Credits, it does appear to bar them from applying those credits in a way that would change the duration of their DC-imposed sentences, *i.e.,* by granting them early supervised release. Even given this limitation that currently exists by virtue of the DC Code, it is possible that Congress intended to permit DC Code offenders to use Time Credits to secure an early transfer to prerelease custody, which does not change the sentence's duration. But the fact that at least part of the FSA Time Credit program is inconsistent with the terms on which the DC Code has committed DC Code felons to Bureau custody suggests otherwise.

In addition, Congress took care to preclude violent U.S. Code offenders from using FSA Time Credits to secure an early release from Bureau facilities, specifying a long list of serious Federal crimes in 18 U.S.C. 3632(d)(4)(D), a conviction for which makes a prisoner ineligible to earn Time Credits.[5] Congress's failure to provide an analogous list of serious DC Code offenses could indicate that Congress did not intend DC Code offenders to be eligible to apply Time Credits. Similarly, the FSA states that the Time Credit system does not apply "with respect to offenses committed before November 1, 1987," (*see* Section

⁵ *See, e.g.,* 164 Cong. Rec. S7642 (daily ed. Dec. 17, 2018) (statement of Sen. Cornyn) ("There are some who, for example, say that this legislation will put violent criminals and sex offenders back on the streets, which is completely false. . . . This bill will not allow dangerous, violent criminals to be released early. . . . We have disqualified violent offenders . . . .").

102(b)(3) of the FSA), which is the date Federal parole was abolished, but does not contain any like provision for the date DC parole was abolished (2000). If the FSA is construed to afford DC Code offenders in Bureau custody a right to apply Time Credits, Congress's failure to account for the date on which DC parole was abolished would mean that some DC Code offenders could be eligible for both parole and the FSA Time Credit program. Congress could have acted to avoid the overlap of these two programs, and the fact that Congress did not do so could further suggest that Congress did not intend the FSA to make DC Code offenders eligible to apply Time Credits.

Finally, there is a textual basis for concluding that Congress did not intend the FSA to make DC Code offenders eligible to use Time Credits. In Section 105 of the FSA, Congress provided that nothing in the FSA "may be construed to provide authority to place a prisoner in prerelease custody or supervised release who is serving a term of imprisonment pursuant to a conviction for an offense under the laws of one of the 50 States, or of a territory or possession of the United States." 18 U.S.C. 3621 Note. As a comment (from the DC Justice Lab, Democracy Forward Foundation, FAMM, Justice Action Network, National Association of Criminal Defense Lawyers, Washington Lawyers' Committee for Civil Rights, and Urban Affairs) noted, it is unclear whether the District of Columbia is "one of the 50 States," a "territory," or a "possession" of the United States. The Bureau agrees that section 105 is ambiguous; statutory references to States and territories may or may not be understood to include the District of Columbia, depending on the statutory context. *See, e.g., District of Columbia* v. *Carter,* 409 U.S. 418, 420 (1973). Particularly in light of the statutory features above, Section 105 could be read to manifest Congress's desire to avoid interference with non-U.S. Code sentences of offenders who end up in Bureau custody.

Overall, there is significant ambiguity about whether and to what extent DC Code offenders are eligible to apply FSA Time Credits under the statute. A construction of the FSA that would allow DC Code offenders to apply Time Credits under federal law would create particular concerns because of the absence of any basis on which to preclude DC Code offenders convicted of violent crimes from them using Time Credits. That result would substantially diverge from the FSA provision that expressly bars federal inmates convicted of any one of a list of 68 categories of enumerated violent offenses (only one

of which includes any DC Code offenses, and only under certain conditions, see 18 U.S.C. 3632(d)(4)(D)(li)) from receiving FSA Time Credits. Although the majority of the comments received during the reopened comment period supported allowing DC Code offenders to earn FSA Time Credits, they largely failed to address the issue of whether violent DC Code offenders should be eligible to apply such credits along with non-violent offenders. A single comment received during the reopened comment period opposed application of the FSA to DC Code offenders in Bureau custody, expressing concern that the rule would "undermine the criminal justice system and allow these violent offenders to re-enter society to only most likely commit these violent crimes again." The lack of additional discussion in the comments regarding this issue is particularly problematic because the overwhelming majority of DC offenders in Bureau custody are serving sentences for violent offenses analogous to the list of offenses that disqualify federal offenders from receiving FSA Time Credits.

The Bureau is also concerned that adopting a reading of the FSA to permit DC Code offenders to leave Bureau facilities before they have served their DC-imposed sentences stands in some tension with other provisions of the DC Code. In other circumstances, where the length of a DC Code offender's sentence would be reduced, there are specific authorities in the DC Code to authorize such actions. For example, the DC Code specifies that offenders sentenced to imprisonment for felonies committed after August 5, 2000, "may receive good time credit toward service of the sentence only as provided in 18 U.S.C. 3624(b)" (DC Code section 24–403.01(d)); that those sentenced to imprisonment after August 5, 2000, "for a nonviolent offense may receive up to a one-year reduction" for completing a substance-abuse-treatment program in accordance with 18 U.S.C. 3621(e)(2) (DC Code section 24–403.01(d–1)(1)); and that certain DC Code offenders who committed their crimes before age 25 have an opportunity to be resentenced to a reduced term (DC Code section 24–403.03). There are no similar provisions to allow DC Code offenders to have sentences reduced by early placement on supervised release under the terms of the FSA.

Many of these considerations implicate the sovereignty of the District of Columbia and its authority over DC Code offenders and could be addressed through local legislation. The Bureau further understands that the DC Council is actively considering whether and

JUNOD, ERIC 51349039

under what circumstances DC Code offenders should be eligible for FSA Time Credits as a matter of DC law. The Council has the authority and latitude to incorporate the FSA Time Credit program by reference into the DC Code and specify which DC Code offenders are eligible to apply FSA Time Credits. The DC Council may, for example, develop a list of excluded DC Code offenses that parallels the list of violent federal offenses in 18 U.S.C. 3632(d)(4)(D), or otherwise clarify whether and in what circumstances inmates may apply Time Credits toward pre-release custody and/or supervised release. Should the Council enact legislation that speaks to the issues presented by the FSA's ambiguity, such legislation could significantly inform, or dictate, the relevance of the FSA's time-credit program to DC Code offenders in the Bureau's custody.

In light of these statutory interpretation and policy considerations, and the current deliberations of the DC Council, the Bureau will defer definitively resolving the FSA's ambiguities with respect to DC Code offenders in its custody. The final rule therefore is amended to reflect the possibility that the DC Council will enact legislation regarding the eligibility of such offenders to apply FSA Time Credits. Thus, any inmate in Bureau custody who is sentenced to a term of imprisonment under the Criminal Code of the District of Columbia is, at present, not eligible to apply FSA Time Credits unless the laws of the District of Columbia are amended to authorize the application of such credits. The Bureau may revisit this question through future rulemaking, depending on the outcome of the DC Council's consideration of these issues, and any other relevant developments.

### Regulatory Certifications

*Executive Orders 12866 and 13563:* Because this proposed rule may raise novel legal or policy issues arising out of implementation of the First Step Act, the Office of Management and Budget (OMB) has determined that it constitutes a "significant regulatory action" under section 3(f) of Executive Order 12866 and has reviewed it.

The economic impact of this rule is limited to a specific subset of inmates who are eligible to earn and apply FSA Time Credits toward additional prerelease custody or early transfer to supervised release. Under the FSA, FSA Time Credits may be earned by an eligible inmate who is assessed to have a minimum or low risk for recidivating and who has had no increased risk of recidivism over the most recent two

consecutive assessments conducted by the Bureau. Consistent with the FSA, inmates in Bureau custody are assessed under its risk and needs assessment system, which includes both static and dynamic elements.

For example, on August 27, 2020, 131,386 inmates had been assessed under the risk and needs assessment tool and received a risk and needs assessment score. The risk and needs assessment scores for the entire group of 131,386 inmates were: 50,060 classified as high; 25,043 classified as medium; 38,084 classified as low; and 18,199 classified as minimum. Of these inmates, approximately 65,000 would be ineligible to earn FSA Time Credits under the FSA due to the inmate's crime of conviction. This data represents a snapshot of those inmates in Bureau custody as of August 27, 2020.

The Bureau conducted risk and needs assessments for Federal inmates and assigned EBRR Programs by the January 15, 2020, FSA deadline. As of that date, recidivism risk assessment levels of High, Medium, Low, or Minimum were assigned to all sentenced inmates at Bureau designated facilities. The Bureau anticipates that this data will change continually, as inmates in custody earn reductions in risk classification, based on program participation and other dynamic factors, and inmates enter and release from Bureau custody.

The Bureau anticipates that as a result of this rule and the FSA, additional inmates will engage in programming to earn FSA Time Credits. As discussed above, FSA Time Credits may be earned for successful completion of an EBRR Program or PA that is assigned to an inmate based on the inmate's needs assessment. The current list of these programs can be found at *https://www.bop.gov/inmates/fsa/docs/2021_fsa_program_guide.pdf*. These programs are available to all inmates regardless of an inmate's eligibility to earn FSA Time Credits.

The rule may also result in movement of eligible inmates who earn FSA Time Credits from Bureau facilities to prerelease custody in the community (including RRCs and home confinement) earlier in the course of their confinement and for a longer period of time than would have previously occurred. In some cases, this transfer of time from secured confinement to prerelease custody may result in increased costs, depending on the relative costs of the inmate's current facility and the costs associated with housing or supervision in prerelease custody.

The rule may also result in the early transfer of inmates from custody to

supervised release, functionally shortening their term of imprisonment. In such cases, the Bureau would avoid costs that would otherwise have been incurred to confine the affected inmates for that amount of time.

At present, therefore, specific monetary costs or savings for these future actions cannot be calculated. But, consistent with the purpose of the statute, the proposed rule will enhance public safety and reduce the need for future incarceration by providing significant incentives to encourage inmates to participate in evidence-based programs intended to reduce their risk of recidivism and help facilitate their successful reentry back into society after they have served their time.[6]

For these reasons, it is not possible to forecast the actual economic effect of this rule. However, given the mix of cost increases and savings which may result, the overall long-term economic impact is expected to be marginal in either direction.

The purpose of this rule is to codify the Bureau's procedures regarding the earning and application of time credits as authorized by the FSA. Time credits may be applied towards prerelease custody or early transfer to supervised release, and some inmates will be eligible for such custody or release as soon as this rule goes into effect. Delaying implementation for 30 days could therefore deprive at least some inmates of time in the less restrictive environments that Congress has determined are appropriate for eligible inmates. Given the liberty issues implicated by the prompt implementation of this program and this rule, the Bureau is prepared to begin implementation immediately, and the Bureau therefore finds good cause for exempting this rule from the provision of the Administrative Procedure Act (5 U.S.C. 553(d)) which ordinarily requires a delay in effective date. The Bureau notes that neither it nor the affected inmates require a delay to adjust their practices before this rule takes effect. A delay in the effective date of this final rule would be unnecessary and contrary to the public interest.

*Executive Order 13132:* This rule will not have substantial direct effect on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various

---

[6] The costs or cost savings resulting from this rule will not be fully realized for years to come, as increasing numbers of inmates have opportunities to earn FSA Time Credits over their terms of incarceration, are transferred to prerelease custody or supervised release, and reintegrate into the community.

JUNOD, ERIC 51349039

levels of government. Therefore, under Executive Order 13132, we determine that this rule does not have sufficient federalism implications to warrant the preparation of a Federalism Assessment.

*Regulatory Flexibility Act:* The Director of the Bureau of Prisons, under the Regulatory Flexibility Act (5 U.S.C. 605(b)), reviewed this rule and certifies that it will not have a significant economic impact upon a substantial number of small entities for the following reasons: This rule pertains to the correctional management of offenders committed to the custody of the Attorney General or the Director of the Bureau of Prisons, and its economic impact is limited to the Bureau's appropriated funds.

*Unfunded Mandates Reform Act of 1995:* This rule will not result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100,000,000 or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions are deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

*Congressional Review Act:* This rule is not a major rule as defined by the Congressional Review Act, 5 U.S.C. 804.

For the foregoing reasons, we issue the regulations regarding the First Step Act Time Credits, proposed on November 25, 2020, with modifications, as set forth below.

**List of Subjects in 28 CFR Parts 523 and 541**

Prisoners.

**Michael D. Carvajal,**
*Director, Federal Bureau of Prisons.*

Under rulemaking authority vested in the Attorney General in 5 U.S.C. 301; 28 U.S.C. 509, 510 and delegated to the Director, Bureau of Prisons in 28 CFR 0.96, we amend 28 CFR parts 523 and 541 as follows:

**Subchapter B—Inmate Admission, Classification, and Transfer**

**PART 523—COMPUTATION OF SENTENCE**

■ 1. The authority citation for 28 CFR part 523 is revised to read as follows:

Authority: 5 U.S.C. 301; 18 U.S.C. 3568 (repealed November 1, 1987, as to offenses committed on or after that date), 3621, 3622, 3624, 3632, 3635, 4001, 4042, 4081, 4082 (repealed in part as to conduct occurring on or after November 1, 1987), 4161–4166 (repealed October 12, 1984, as to offenses committed on or after November 1, 1987), 5006–5024 (repealed October 12, 1984, as to conduct occurring after that date), 5039; 28 U.S.C. 509, 510.

■ 2. Add subpart E to read as follows:

**Subpart E—First Step Act Time Credits**

Sec.
523.40 Purpose.
523.41 Definitions.
523.42 Earning First Step Act Time Credits.
523.43 Loss of FSA Time Credits.
523.44 Application of FSA Time Credits.

**§ 523.40 Purpose.**

(a) The purpose of this subpart is to describe procedures for the earning and application of Time Credits as authorized by 18 U.S.C. 3632(d)(4) and Section 101 of the First Step Act of 2018 (Pub. L. 115–391, December 21, 2018, 132 Stat. 5194) (FSA), hereinafter referred to as "FSA Time Credits" or "Time Credits."

(b) Generally, as defined and described in this subpart, an eligible inmate who successfully participates in Evidence-Based Recidivism Reduction (EBRR) Programs or Productive Activities (PAs) that are recommended based on the inmate's risk and needs assessment may earn FSA Time Credits to be applied toward prerelease custody or early transfer to supervised release under 18 U.S.C. 3624(g).

**§ 523.41 Definitions.**

(a) *Evidence-Based Recidivism Reduction (EBRR) Program.* An EBRR Program is a group or individual activity that has been shown by empirical evidence to reduce recidivism or is based on research indicating that it is likely to be effective in reducing recidivism; and is designed to help prisoners succeed in their communities upon release from prison. EBRR Programs may include, but are not limited to, those involving the following types of activities:

(1) Social learning and communication, interpersonal, anti-bullying, rejection response, and other life skills;

(2) Family relationship building, structured parent-child interaction, and parenting skills;

(3) Classes on morals or ethics;

(4) Academic classes;

(5) Cognitive behavioral treatment;

(6) Mentoring;

(7) Substance abuse treatment;

(8) Vocational training;

(9) Faith-based classes or services;

(10) Civic engagement and reintegrative community services;

(11) Inmate work and employment opportunities;

(12) Victim impact classes or other restorative justice programs; and

(13) Trauma counseling and trauma-informed support programs.

(b) *Productive Activity (PA).* A PA is a group or individual activity that

allows an inmate to remain productive and thereby maintain or work toward achieving a minimum or low risk of recidivating.

(c) *Successful participation.* (1) An eligible inmate must be "successfully participating" in EBRR Programs or PAs to earn FSA Time Credits for those EBRR Programs or PAs.

(2) "Successful participation" requires a determination by Bureau staff that an eligible inmate has participated in the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment, and has complied with the requirements of each particular EBRR Program or PA.

(3) Temporary operational or programmatic interruptions authorized by the Bureau that would prevent an inmate from participation in EBRR programs or PAs will not ordinarily affect an eligible inmate's "successful participation" for the purposes of FSA Time Credit eligibility.

(4) An eligible inmate, as described in paragraph (d) of this section, will generally not be considered to be "successfully participating" in EBRR Programs or PAs in situations including, but not limited to:

(i) Placement in a Special Housing Unit;

(ii) Designation status outside the institution (*e.g.,* for extended medical placement in a hospital or outside institution, an escorted trip, a furlough, etc.);

(iii) Temporary transfer to the custody of another Federal or non-Federal government agency (*e.g.,* on state or Federal writ, transfer to state custody for service of sentence, etc.);

(iv) Placement in mental health/psychiatric holds; or

(v) "Opting out" (choosing not to participate in the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment).

(5)(i) If an eligible inmate "opts out," or chooses not to participate in any of the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment, the inmate's choice must be documented by staff.

(ii) Opting out will not, by itself, be considered a disciplinary violation. However, violation of specific requirements or rules of a particular recommended EBRR Program or PA, including refusal to participate or withdrawal, may be considered a disciplinary violation (*see* this part).

(iii) Opting out will result in exclusion from further benefits or privileges allowable under the FSA,

JUNOD, ERIC 51349039

until the date the inmate "opts in" (chooses to participate in the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment, as documented by staff).

(d) *Eligible inmate*—(1) *Eligible to earn FSA Time Credits.* An inmate who is *eligible to earn FSA Time Credits* is an *eligible inmate* for the purposes of this subpart. Any inmate sentenced to a term of imprisonment pursuant to a conviction for a Federal criminal offense, or any person in the custody of the Bureau, is *eligible to earn* FSA Time Credits, subject to the exception described in paragraph (d)(2) of this section.

(2) *Exception.* If the inmate is serving a term of imprisonment for an offense specified in 18 U.S.C. 3632(d)(4)(D), the inmate is not *eligible to earn* FSA Time Credits.

### § 523.42   Earning First Step Act Time Credits.

(a) *When an eligible inmate begins earning FSA Time Credits.* An eligible inmate begins earning FSA Time Credits after the inmate's term of imprisonment commences (the date the inmate arrives or voluntarily surrenders at the designated Bureau facility where the sentence will be served).

(b) *Dates of participation in EBRRs or PAs.* (1) An inmate cannot earn FSA Time Credits for programming or activities in which he or she participated before December 21, 2018, the date of enactment of the First Step Act of 2018.

(2) An eligible inmate, as defined in this subpart, may earn FSA Time Credits for programming and activities in which he or she participated from December 21, 2018, until January 14, 2020.

(3) An eligible inmate, as defined in this subpart, may earn FSA Time Credit if he or she is successfully participating in EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment on or after January 15, 2020.

(c) *Amount of FSA Time Credits that may be earned.* (1) For every thirty-day period that an eligible inmate has successfully participated in EBRR Programs or PAs recommended based on the inmate's risk and needs assessment, that inmate will earn ten days of FSA Time Credits.

(2) For every thirty-day period that an eligible inmate has successfully participated in EBRR Programs or PAs recommended based on the inmate's risk and needs assessment, that inmate will earn an additional five days of FSA Time Credits if the inmate:

(i) Is determined by the Bureau to be at a minimum or low risk for recidivating; and

(ii) Has maintained a consistent minimum or low risk of recidivism over the most recent two consecutive risk and needs assessments conducted by the Bureau.

### § 523.43   Loss of FSA Time Credits.

(a) *Procedure for loss of FSA Time Credits.* An inmate may lose earned FSA Time Credits for violation of the requirements or rules of an EBRR Program or PA. The procedures for loss of FSA Time Credits are described in 28 CFR part 541.

(b) *How to appeal loss of FSA Time Credits.* Inmates may seek review of the loss of earned FSA Time Credits through the Bureau's Administrative Remedy Program (28 CFR part 542).

(c) *Restoration of FSA Time Credits.* An inmate who has lost FSA Time Credits under this subpart may have part or all of the FSA Time Credits restored to him or her, on a case-by-case basis, after clear conduct (behavior clear of inmate disciplinary infractions under 28 CFR part 541) for two consecutive risk and needs assessments conducted by the Bureau.

### § 523.44   Application of FSA Time Credits.

(a) *How Time Credits may be applied.* For any inmate eligible to earn FSA Time Credits under this subpart who is:

(1) Sentenced to a term of imprisonment under the U.S. Code, the Bureau may apply FSA Time Credits toward prerelease custody or supervised release as described in paragraphs (c) and (d) of this section.

(2) Subject to a final order of removal under immigration laws as defined in 8 U.S.C. 1101(a)(17) (*see* 18 U.S.C. 3632(d)(4)(E)), the Bureau may not apply FSA Time Credits toward prerelease custody or early transfer to supervised release.

(3) Serving a term of imprisonment pursuant to a conviction for an offense under laws other than the U.S. Code (see Section 105 of the FSA, Pub. L. 115–391, 132 Stat. 5214 (not codified; included as note to 18 U.S.C. 3621)), the Bureau may not apply FSA Time Credits toward prerelease custody or early transfer to supervised release. This paragraph (a)(3) will not bar the application of FSA Time Credits, as authorized by the DC Code, for those serving a term of imprisonment for an offense under the DC Code.

(b) *Consideration for application of FSA Time Credits.* Where otherwise permitted by this subpart, the Bureau may apply FSA Time Credits toward prerelease custody or early transfer to

supervised release under 18 U.S.C. 3624(g) only if an eligible inmate has:

(1) Earned FSA Time Credits in an amount that is equal to the remainder of the inmate's imposed term of imprisonment;

(2) Shown through the periodic risk reassessments a demonstrated recidivism risk reduction or maintained a minimum or low recidivism risk, during the term of imprisonment; and

(3) Had the remainder of his or her imposed term of imprisonment computed under applicable law.

(c) *Prerelease custody.* The Bureau may apply earned FSA Time Credits toward prerelease custody only when an eligible inmate has, in addition to satisfying the criteria in paragraph (b) of this section:

(1) Maintained a minimum or low recidivism risk through his or her last two risk and needs assessments; or

(2) Had a petition to be transferred to prerelease custody or supervised release approved by the Warden, after the Warden's determination that:

(i) The prisoner would not be a danger to society if transferred to prerelease custody or supervised release;

(ii) The prisoner has made a good faith effort to lower their recidivism risk through participation in recidivism reduction programs or productive activities; and

(iii) The prisoner is unlikely to recidivate.

(d) *Transfer to supervised release.* The Bureau may apply FSA Time Credits toward early transfer to supervised release under 18 U.S.C. 3624(g) only when an eligible inmate has, in addition to satisfying the criteria in paragraphs (b) and (c) of this section:

(1) An eligible inmate has maintained a minimum or low recidivism risk through his or her last risk and needs assessment;

(2) An eligible inmate has a term of supervised release after imprisonment included as part of his or her sentence as imposed by the sentencing court; and

(3) The application of FSA Time Credits would result in transfer to supervised release no earlier than 12 months before the date that transfer to supervised release would otherwise have occurred.

**Subchapter C—Institutional Management**

## PART 541—INMATE DISCIPLINE AND SPECIAL HOUSING UNITS

■ 3. The authority citation for part 541 continues to read as follows:

**Authority:** 5 U.S.C. 301; 18 U.S.C. 3621, 3622, 3624, 4001, 4042, 4081, 4082 (Repealed in part as to offenses committed on or after November 1, 1987), 4161–4166 (Repealed as

JUNOD, ERIC 51349039

to offenses committed on or after November 1, 1987), 5006–5024 (Repealed October 12, 1984 as to offenses committed after that date), 5039; 28 U.S.C. 509, 510.

■ 4. Amend § 541.3 in paragraph (b), Table 1, by:

■ a. Under the heading ''Available Sanctions for Greatest Severity Level Prohibited Acts'', adding the entry B.2 in alphanumeric order;

■ b. Under the heading ''Available Sanctions for High Severity Level Prohibited Acts'', adding the entry B.2 in alphanumeric order;

■ c. Under the heading ''Available Sanctions for Moderate Severity Level Prohibited Acts'', adding the entry B.2 in alphanumeric order; and

■ d. Under the heading ''Available Sanctions for Low Severity Level Prohibited Acts'', adding the entry B.2 in alphanumeric order.

The additions read as follows:

**§ 541.3   Prohibited acts and available sanctions.**

\*    \*    \*    \*    \*

(b) \*  \*  \*

TABLE 1—PROHIBITED ACTS AND AVAILABLE SANCTIONS

| | | | | | | |
|---|---|---|---|---|---|---|
| \* | \* | \* | \* | \* | \* | \* |

**Available Sanctions for Greatest Severity Level Prohibited Acts**

| | | | | | | |
|---|---|---|---|---|---|---|
| \* | \* | \* | \* | \* | \* | \* |

B.2 ............................ Forfeit up to 41 days of earned First Step Act (FSA) Time Credits (*see* 28 CFR part 523, subpart E) for each prohibited act committed.

| | | | | | | |
|---|---|---|---|---|---|---|
| \* | \* | \* | \* | \* | \* | \* |

**Available Sanctions for High Severity Level Prohibited Acts**

| | | | | | | |
|---|---|---|---|---|---|---|
| \* | \* | \* | \* | \* | \* | \* |

B.2 ............................ Forfeit up to 27 days of earned FSA Time Credits for each prohibited act committed.

| | | | | | | |
|---|---|---|---|---|---|---|
| \* | \* | \* | \* | \* | \* | \* |

**Available Sanctions for Moderate Severity Level Prohibited Acts**

| | | | | | | |
|---|---|---|---|---|---|---|
| \* | \* | \* | \* | \* | \* | \* |

B.2 ............................ Forfeit up to 14 days of earned FSA Time Credits for each prohibited act committed.

| | | | | | | |
|---|---|---|---|---|---|---|
| \* | \* | \* | \* | \* | \* | \* |

**Available Sanctions for Low Severity Level Prohibited Acts**

| | | | | | | |
|---|---|---|---|---|---|---|
| \* | \* | \* | \* | \* | \* | \* |

B.2 ............................ Forfeit up to 7 days of earned FSA Time Credits (only where the inmate is found to have committed a second violation of the same prohibited act within 6 months; forfeit up to 14 days of FSA Time Credits (only where the inmate is found to have committed a third violation of the same prohibited act within 6 months).

| | | | | | | |
|---|---|---|---|---|---|---|
| \* | \* | \* | \* | \* | \* | \* |

\*    \*    \*    \*    \*

■ 5. Amend § 541.7 by revising paragraph (f) to read as follows:

**§ 541.7   Unit Discipline Committee (UDC) review of the incident report.**

\*    \*    \*    \*    \*

(f) *Sanctions.* If you committed a prohibited act or prohibited acts, the UDC can impose any of the available sanctions in Tables 1 and 2 of § 541.3, except loss of good conduct time credit, FSA Time Credits, disciplinary segregation, or monetary fines.

[FR Doc. 2022–00918 Filed 1–14–22; 4:15 pm]

**BILLING CODE P**

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 52**

**[EPA–R05–OAR–2021–0535; FRL–9444–02–R5]**

**Air Plan Approval; Wisconsin; Wisconsin Nonattainment New Source Review Certification for the 2015 Ozone NAAQS**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Direct final rule.

**SUMMARY:** The Environmental Protection Agency (EPA) is approving, as a State Implementation Plan (SIP) revision, Wisconsin's certification that its SIP satisfies the nonattainment new source review (NNSR) requirements of the Clean Air Act (CAA) for the 2015 ozone National Ambient Air Quality Standard (NAAQS).

**DATES:** This direct final rule will be effective March 21, 2022, unless EPA receives adverse comments by February 18, 2022. If adverse comments are received, EPA will publish a timely withdrawal of the direct final rule in the **Federal Register** informing the public that the rule will not take effect.

**ADDRESSES:** Submit your comments, identified by Docket ID No. EPA–R05–OAR–2021–0535 at *http://www.regulations.gov* or via email to *damico.genevieve@epa.gov.* For comments submitted at *Regulations.gov*, follow the online instructions for submitting comments. Once submitted,

JUNOD, ERIC  51349039

EXHIBIT C

 **U.S. Department of Justice**
Federal Bureau of Prisons

PROGRAM STATEMENT
OPI: CPD/CPB
NUMBER: 5410.01
DATE: November 18, 2022

# First Step Act of 2018 - Time Credits: Procedures for Implementation of 18 U.S.C. § 3632(d)(4)

*/s/*
*Approved*: Colette S. Peters
Director, Federal Bureau of Prisons

1. **PURPOSE AND SCOPE**

**§ 523.40 Purpose.**

**(a) The purpose of this subpart is to describe procedures for the earning and application of Time Credits as authorized by 18 U.S.C. 3632(d)(4) and Section 101 of the First Step Act of 2018 (Pub. L. 115-391, December 21, 2018, 132 Stat. 5194) (FSA), hereinafter referred to as "FSA Time Credits" or "Time Credits."**

**(b) Generally, as defined and described in this subpart, an eligible inmate who successfully participates in Evidence-Based Recidivism Reduction (EBRR) Programs or Productive Activities (PAs) that are recommended based on the inmate's risk and needs assessment may earn FSA Time Credits to be applied toward prerelease custody or early transfer to supervised release under 18 U.S.C. 3624(g).**

The purpose of this policy is to establish Bureau of Prisons (Bureau) criteria and procedures for awarding time credits pursuant to 18 U.S.C § 3632(d)(4) and 18 U.S.C § 3624(g) to eligible inmates under the provisions of First Step Act of 2018 (FSA) codified in part in Title 18 U.S.C. § 3632.

**Federal Regulations from 28 CFR are shown in this type.**
Implementing instructions are shown in this type.

a. **Program Objectives**. The expected results of this Program Statement are to:

- Inform inmates and staff of the process for earning, documenting, applying, forfeiting, and restoring after forfeiture FSA Time Credits (FTCs) in accordance with the FSA.
- Inform inmates and staff of the circumstances which would preclude an inmate from earning and/or applying FTCs.
- Identify the process for applying FTCs in combination with the Residential Drug Abuse Treatment Program (RDAP) early release benefit under 18 U.S.C. § 3621(e).

b. **Institution Supplement**. None required. Should local facilities make any changes outside changes required in national policy or establish any additional local procedures to implement national policy, the local Union may invoke to negotiate procedures or appropriate arrangements.

## 2. BACKGROUND

The FSA provides eligible inmates may earn FTCs for successfully participating and completing approved EBRR programs or PAs. The FSA prohibits inmates from receiving credit prior to its enactment, prior to the commencement of the inmate's sentence, or if the inmate is serving a sentence for a disqualifying offense or has a disqualifying prior conviction. The FSA allows qualifying inmates to apply FTCs toward prerelease community-based placement (i.e., Residential Reentry Center (RRC) and/or home confinement (HC)). Further, at the discretion of the Director of the Federal Bureau of Prisons (Director), the FSA allows for FTC to be applied toward early release to supervision.

## 3. DEFINITIONS OF TERMS

§ 523.41 Definitions.

(a) *Evidence-Based Recidivism Reduction (EBRR) Program.* **An EBRR Program is a group or individual activity that has been shown by empirical evidence to reduce recidivism or is based on research indicating that it is likely to be effective in reducing recidivism; and is designed to help prisoners succeed in their communities upon release from prison. EBRR Programs may include, but are not limited to, those involving the following types of activities:**

> **(1) Social learning and communication, interpersonal, anti-bullying, rejection response, and other life skills;**
> **(2) Family relationship building, structured parent-child interaction, and parenting skills;**
> **(3) Classes on morals or ethics;**

    **(4) Academic classes;**
    **(5) Cognitive behavioral treatment;**
    **(6) Mentoring;**
    **(7) Substance abuse treatment;**
    **(8) Vocational training;**
    **(9) Faith-based classes or services;**
    **(10) Civic engagement and reintegrative community services;**
    **(11) Inmate work and employment opportunities;**
    **(12) Victim impact classes or other restorative justice programs; and**
    **(13) Trauma counseling and trauma-informed support programs.**

A list of approved EBRR programs is available on the FSA resource page of the Bureau's public website and the Correctional Programs Branch and Reentry Services Division's intranet pages. The list will be updated as programs/activities are added.

**(b)** *Productive Activity (PA).* **A PA is a group or individual activity that allows an inmate to remain productive and thereby maintain or work toward achieving a minimum or low risk of recidivating.**

Productive activities include a variety of groups, programs, classes and individual activities which can be either structured or unstructured. These pro-social activities contribute to an inmate's overall positive institutional adjustment, to include maintaining clear institution conduct, and include, but are not limited to:

- Structured, curriculum-based group programs and classes
- Productive, free-time activities (e.g., recreation, hobby crafts, or religious services)
- Family interaction activities (e.g., social visiting)
- Personal growth and development classes (e.g., adult continuing education classes)
- Institution work programs
- Community service projects
- Participation in an Inmate Financial Responsibility plan

The Bureau has approved a group of specific, structured, curriculum-based PAs which are available to assist the inmate in addressing identified needs. The list is available on the FSA resource page of the Bureau's public website and the Correctional Programs Branch and Reentry Services Division intranet pages. The list will be updated as programs/activities are added.

**(c)** *Successful participation.*

    **(1) An eligible inmate must be "successfully participating" in EBRR Programs or**

PAs to earn FSA Time Credits for those EBRR Programs or PAs.
(2) "Successful participation" requires a determination by Bureau staff that an eligible inmate has participated in the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment, and has complied with the requirements of each particular EBRR Program or PA.

An inmate will remain in FTC earning status while on any waitlist for EBRR Programs or PAs recommended based on the inmate's needs assessment, not to exceed two assessment periods, as long as the inmate has not refused or declined to participate. Active participation in at least one EBRR Program or PA by the inmate supersedes this requirement. Exceptions to the two-assessment period time frame can be granted by the Regional Director upon request from the Warden. However, should an inmate refuse or decline to participate in the recommended EBRR program or PA for which they had been on a waitlist, staff will enter the applicable decline code in SENTRY, and the inmate will be considered declined, or opted out, for the entire waitlist period. The waitlist period is defined in terms of the corresponding need area(s). When an inmate declines participation after being on a waitlist, the auto-calculation application will first identify any need areas associated with the declined program and then identify the oldest waitlist associated with the need area(s). Any credits earned since the oldest waitlist associated with the need area, without intervening participation, will be rescinded to reflect the inmate's refusal.

(3) **Temporary operational or programmatic interruptions authorized by the Bureau that would prevent an inmate from participation in EBRR programs or PAs will not ordinarily affect an eligible inmate's "successful participation" for the purposes of FSA Time Credit eligibility.**
(4) **An eligible inmate, as described in paragraph (d) of this section, will generally not be considered to be "successfully participating" in EBRR Programs or PAs in situations including, but not limited to:**
 (i) **Placement in a Special Housing Unit;**

Inmates in Disciplinary Segregation status will not be considered to be "successfully participating." Inmates in restrictive housing for Administrative Detention shall obtain FTCs if they otherwise remain in earning status under the policy.

(ii) **Designation status outside the institution (*e.g.,* for extended medical placement in a hospital or outside institution, an escorted trip, a furlough, etc.);**
(iii) **Temporary transfer to the custody of another Federal or non-Federal government agency (*e.g.,* on state or Federal writ, transfer to state custody for service of sentence, etc.);**

In the case of placement or transfers outside the institution (e.g., furlough, writ, escorted trip, outside hospital placement, etc.), an inmate will continue to earn FTCs if they are in the institution for any part of the day. An inmate must be out of the institution for the entire 24-hour day before the inmate reverts to non-earning status.  Upon return to the institution, the inmate's earning status will resume.

**(iv) Placement in mental health/psychiatric holds; or**
**(v) "Opting out" (choosing not to participate in the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment).**

An inmate is considered to be opting out, and therefore, is not in earning status, if the inmate refuses or declines to participate in any EBRR programs or structured, curriculum-based PAs recommended based on an identified need. Further, an inmate is considered to be opting out if the inmate refuses to participate in or fails to complete any portion of the Standardized Prisoner Assessment for Reduction in Criminality (SPARC-13), the Bureau's assessment system.  See the Program Statement **First Step Act Needs Assessment**.

**(5)(i) If an eligible inmate "opts out," or chooses not to participate in any of the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment, the inmate's choice must be documented by staff.**

An inmate's refusal to complete any portion of the SPARC-13 or to participate in EBRR programs or structured, curriculum-based PAs recommended to address an identified need is documented in SENTRY using FSA-specific assignments. See the Program Statement **First Step Act Needs Assessment.**

**(ii) Opting out will not, by itself, be considered a disciplinary violation. However, violation of specific requirements or rules of a particular recommended EBRR Program or PA, including refusal to participate or withdrawal, may be considered a disciplinary violation. (*see* this part: 28 C.F.R. part 541)**
**(iii) Opting out will result in exclusion from further benefits or privileges allowable under the FSA, until the date the inmate "opts in" (chooses to participate in the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment, as documented by staff).**

Note: C.F.R. citation added due to typographical error in published regulations.

(d) *Eligible inmate* —
 (1) *Eligible to earn FSA Time Credits.* An inmate who is *eligible to earn* FSA Time Credits is an *eligible inmate* for the purposes of this subpart. Any inmate sentenced to a term of imprisonment pursuant to a conviction for a Federal criminal offense, or any person in the custody of the Bureau, is *eligible to earn* FSA Time Credits, subject to the exception described in paragraph (d)(2) of this section.
 (2) *Exception.* If the inmate is serving a term of imprisonment for an offense specified in 18 U.S.C. 3632(d)(4)(D), the inmate is not *eligible to earn* FSA Time Credits.

Federal inmates in state custody are not eligible to earn FTCs. Additionally, state boarders, treaty transfers inmates, and military inmates sentenced pursuant to the Uniform Code of Military Justice who are serving their sentence in Bureau custody are not eligible to earn FTCs.

Inmates sentenced under the Code of District of Columbia (DC Code) cannot earn FTCs unless or until the DC Council defines eligibility to earn FTCs (i.e., which DC Code offenses, if any, preclude eligibility). If and when the earning of FTCs is authorized for inmates sentenced under DC Code, the unit team will review inmates for eligibility and enter the applicable eligibility assignment into SENTRY. Any retroactive application of FTCs will be made consistent with the authorities granted under DC Code.

## 4. DETERMINATION OF ELIGIBILITY

At the inmate's Initial Classification, the unit team will conduct a review of the inmate's current conviction(s) as well as prior criminal convictions to determine the inmate's eligibility to earn FTCs.

For the current offense(s) review, the unit team will review the Judgement & Commitment (J&C) Order and the Presentence Investigation Report (PSR) for sentencing enhancements, if necessary, to determine if the inmate is ineligible. The list of FTC ineligible offenses, identified by statute, based on the inmate's current offense(s) is available on the FSA resource page of the Bureau's public website and the Correctional Programs Branch intranet page. If an inmate is determined to be ineligible based on the current offense(s), no review of prior offenses is required.

For the prior conviction review, an inmate is ineligible to earn FTCs if:

■ The current offense is determined to be a "serious violent felony" not already specifically listed by the statute, and

- The inmate was sentenced to a term of imprisonment of more than a year for the current offense, and
- The inmate served a term of imprisonment of more than a year for a previous federal or state offense consisting of murder, voluntary manslaughter, assault with intent to commit murder, aggravated sexual abuse and sexual abuse, abusive sexual contact, kidnapping, carjacking, arson, or terrorism.

Additional criteria regarding the prior offense include:

- The conviction must have been based on an adult conviction. Juvenile adjudications are not considered, and
- If the prior conviction is a state offense, the state offense must match the specific federal offense listed above element-by-element.

For purposes of this review only, "serious violent felony" offense is defined by 18 U.S.C. § 3559(c)(2)(F):

> (i) a Federal or State offense, by whatever designation and wherever committed, consisting of murder (as described in section 1111); manslaughter other than involuntary manslaughter (as described in section 1112); assault with intent to commit murder (as described in section 113(a)); assault with intent to commit rape; aggravated sexual abuse and sexual abuse (as described in sections 2241 and 2242); abusive sexual contact (as described in sections 2244(a)(1) and (a)(2)); kidnapping; aircraft piracy (as described in section 46502 of Title 49); robbery (as described in section 2111, 2113, or 2118); carjacking (as described in section 2119); extortion; arson; firearms use; firearms possession (as described in section 924(c)); or attempt, conspiracy, or solicitation to commit any of the above offenses; and

> (ii) any other offense punishable by a maximum term of imprisonment of 10 years or more that has as an element the use, attempted use, or threatened use of physical force against the person of another or that, by its nature, involves a substantial risk that physical force against the person of another may be used in the course of committing the offense[.]

Due to the complexity of the prior offense review, questions regarding whether an offense is disqualifying may be referred to an institution's local Consolidated Legal Center (CLC) for guidance.

An inmate's eligibility status will be documented on the inmate's Individualized Needs Plan in the **Insight case management system**, and the inmate will receive a copy. The unit team will also enter the appropriate FSA eligibility assignment into SENTRY.

## 5. RISK AND NEED ASSESSMENT

All sentenced inmates, regardless of eligibility status, will receive both a risk and need assessment. The Prisoner Assessment Tool Targeting Estimated Risk and Needs (PATTERN) is the recidivism risk assessment tool and part of the Bureau's FSA-approved Risk and Needs Assessment System. The PATTERN tool is completed during the inmate's Initial Classification and is used to assign each incoming inmate an initial recidivism risk level of Minimum, Low, Medium, or High. The Standardized Prisoner Assessment for Reduction in Criminality (SPARC-13) is the Bureau's needs assessment system and the other half of the Bureau's FSA-approved Risk and Needs Assessment System. It is used to assess the inmate in 13 need areas which can be targeted to reduce the inmate's risk of recidivating. See the Program Statement **First Step Act Needs Assessment.**

After the inmate's arrival to their designated facility for service of their sentence and during the initial admission and orientation phase, the PATTERN and SPARC-13 assessments will be completed. While PATTERN is completed during the inmate's Initial Classification, the SPARC-13 is a multi-part, multi-department assessment process. Ordinarily, the Initial Classification is completed within 28 days of the inmate's arrival, but completing the PATTERN tool requires the inmate's sentence computation to be completed. If the sentence computation is incomplete, the Initial Classification should be delayed pending its completion, and the basis for delay should be annotated on the inmate's Program Review Report. The SPARC-13 is ordinarily completed within the 30 days of an inmate's arrival, however, portions of the SPARC-13 assessment require the inmate's active participation. Failure on the inmate's part to complete the survey assessments timely will delay completion and negatively impact the inmate's ability to begin earning FTCs as the inmate will be considered "opted out," and therefore is in non-earning status regardless of eligibility to earn FTCs.

Using SPARC-13, staff will recommend and document EBRR programs and/or PAs for inmates consistent with the requirements of the Program Statement **First Step Act Needs Assessment.** If the inmate declines to participate in an EBRR program or PA which has been recommended based on an identified needs area, the department staff assessing the need area will enter a program decline code indicating the inmate's opt out status; otherwise, the inmate will be placed in the program or on a waitlist with the applicable assignment keyed into SENTRY by the department staff assessing the need area.

Should an inmate later refuse or decline to participate in the recommended EBRR program or PA for which they had been on a waitlist, staff will enter the applicable decline code in SENTRY, and the inmate will be considered declined for the entire period on the waitlist. Any credits earned during the waitlist period will be rescinded to reflect the inmate's refusal.

If an inmate fails to complete a recommended EBRR or PA to address an identified need area, staff will enter the applicable fail or withdraw code into SENTRY, and the inmate will not be considered to have opted out, and, therefore, in non-earning status. Inmates with cognitive or physical disabilities may require more time or additional accommodations to complete an EBRR program or PA. The Program Statement **Management of Inmates with Disabilities** provides guidance on developing local accommodations. If questions about the impact of a disability on earning FTC arise, staff may contact the Women and Special Populations Branch in the Reentry Services Division.

During the inmate's Initial Classification, the unit team will develop an Individualized Need Plan for the inmate based on the results of the inmate's needs assessment and related recommendations provided by the departments that assessed the need area as documented in SENTRY and Insight Feedback. Recommendations may include EBRR programs and/or structured curriculum-based PAs designed to address the inmate's identified need areas and based on the inmate's ability to complete the program/activity.

Additional groups, programs, classes, or unstructured activities may be recommended to assist the inmate in establishing positive institutional adjustment and involvement in pro-social activities. The inmate's risk level, needs assessment results, and program recommendations will be documented on the inmate's Insight Individualized Need Plan, and the inmate will receive a copy.

An inmate will be reassessed for both risk level and needs at each regularly scheduled Program Review throughout the remainder of the inmate's incarceration **at a BOP institution**. As defined in the Program Statement **Inmate Classification and Program Review**, the unit team will document the inmate's progress toward recommended goals and update the Individualized Need Plan, as appropriate. The inmate will receive a copy of their updated Individualized Need Plan which will include the reassessed risk level, need areas, and program recommendations. **Inmates placed in prerelease custody, and who are not subject to regularly scheduled program review, will not receive reassessments. For inmates in pre-release placement, reassessments will be completed automatically on a monthly basis and will capture changes which occur during prerelease placement.**

## 6.  HOW TO EARN FTCs

### § 523.42 Earning First Step Act Time Credits.

**(a)** *When an eligible inmate begins earning FSA Time Credits.* An eligible inmate begins earning FSA Time Credits after the inmate's term of imprisonment commences (the date the inmate arrives or voluntarily surrenders at the designated Bureau facility where the

sentence will be served).

Because the ability to accrue time credits begins after the inmate's current term of incarceration begins (e.g., the date the inmate arrives at or voluntary surrenders to their initially designated Bureau facility to serve their sentence), an inmate cannot earn FTCs during pretrial confinement, nor can they earn credits based on a prior incarceration. Further, an inmate cannot earn FTC when not in Bureau custody, including when in U.S. Marshals Service custody prior to arriving at their designated facility, regardless of where they are housed, or once released to their supervised release term.

(b) *Dates of participation in EBRRs or PAs.*
   **(1) An inmate cannot earn FSA Time Credits for programming or activities in which he or she participated before December 21, 2018, the date of enactment of the First Step Act of 2018.**
   **(2) An eligible inmate, as defined in this subpart, may earn FSA Time Credits for programming and activities in which he or she participated from December 21, 2018, until January 14, 2020.**
   **(3) An eligible inmate, as defined in this subpart, may earn FSA Time Credit if he or she is successfully participating in EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment on or after January 15, 2020.**

(c) *Amount of FSA Time Credits that may be earned.*
   **(1) For every thirty-day period that an eligible inmate has successfully participated in EBRR Programs or PAs recommended based on the inmate's risk and needs assessment, that inmate will earn ten days of FSA Time Credits.**
   **(2) For every thirty-day period that an eligible inmate has successfully participated in EBRR Programs or PAs recommended based on the inmate's risk and needs assessment, that inmate will earn an additional five days of FSA Time Credits if the inmate:**
      **(i) Is determined by the Bureau to be at a minimum or low risk for recidivating; and**
      **(ii) Has maintained a consistent minimum or low risk of recidivism over the most recent two consecutive risk and needs assessments conducted by the Bureau.**

The calculation of FTCs is fully automated and based on the number of 30-day periods in earning status. Additionally, the eligibility to earn FTCs is distinct from the ability to apply/use FTCs.

**For inmates in prerelease custody, "the most recent two consecutive risk assessments" refers to the final two risk assessments conducted while the inmate was at a BOP institution, prior to the application of FTCs, i.e., the inmate's transfer to supervised release or prerelease custody. For those inmates who have not completed two assessments prior to transfer to prerelease custody, reassessments will be completed automatically on a monthly basis and will capture changes which occur during prerelease placement.**

## 7. LIMITATIONS ON EARNING OF FTCs

Despite being eligible to earn FTCs, there are situations where an inmate is unable or unwilling to participate in EBRR programs or PAs, and therefore cannot earn FTCs. Such circumstances may include, but are not limited to, the following:

- Placement in Disciplinary Segregation status);
- Designation status outside the institution (e.g., an outside medical trip or escorted trip, in-transit or at an in-transit facility, a furlough for the full day, etc.);
- Placement in the custody of another jurisdiction (e.g., on state or federal writ, transfer to state custody for service of sentence, transfer to another federal agency, etc.);
- Placement in mental health/psychiatric holds;
- Detention as a material witness or for civil contempt;
- Placement in civil commitment; or
- "Opting out" (choosing not to participate in the EBRR programs or PAs that the Bureau has recommended based on the inmate's individualized risk and needs assessment).

If an inmate refuses to participate in required programs (e.g., Inmate Financial Responsibility (FRP), Drug Education, etc.), the inmate will not earn FTC. While these programs are voluntary, the refusal to participate can result in the loss of certain benefits including the inability to earn FTCs.

## 8. TRACKING AND EARNING OF FTCs

FTCs are awarded based on the inmate's eligibility to earn credit, completion of the PATTERN and SPARC-13 assessments, and ongoing participation in programs designed to reduce the risk of recidivating. Once an inmate is in earning status, they will remain in earning status unless or until the limitations outlined in the previous section of this Program Statement are applied.

FTCs are auto-calculated based on 30-day increments in earning status. Partial credit will not be awarded. FTCs will be credited on a monthly basis agency-wide, as well as during the inmate's regularly scheduled Program Reviews, based on a completed 30-day period. No FTCs will post to the inmate's record if he/she has not accrued 30 days in earning status. Rather, any days in FTC earning status will carry over to the next monthly cycle, and the inmate will receive all

applicable FTCs at that time.

For example: If the first monthly posting of FTCs for an inmate occurs only five days after completing their initial assessments and going into earning status, no FTCs will post to the inmate's record as they have not yet accrued 30 days in earning status. Rather, the five days will carry over to the next monthly cycle, and the inmate will receive the FTCs at the end of the second month. If later, the inmate goes into FRP Refuse or declines a recommended needs-related program and goes into opt out status, the inmate is no longer in earning status, and therefore, stops accruing days toward FTCs and no FTCs will post to the inmate's record. Once the inmate returns to earning status, they will resume accruing days toward the earning of FTCs.

**FSA Time Credit Assessments (FTC Worksheets) will be automatically uploaded to the Inmate Central File during each auto-calculation. Inmates will be provided a copy of the most recent FTC Worksheet during regularly scheduled program reviews.**

### 9.  LOSS AND RESTORATION OF FTCs

§ 523.43 Loss of FSA Time Credits.

*(a) Procedure for loss of FSA Time Credits.* **An inmate may lose earned FSA Time Credits for violation of the requirements or rules of an EBRR Program or PA. The procedures for loss of FSA Time Credits are described in** 28 **CFR part 541.**

Per the FSA, only earned time credits can be lost, and future time credits cannot be impacted. For purposes of inmate discipline, time credits are considered officially "earned" during the monthly auto-calculation or at the time of the inmate's last Program Review assessment, whichever was most recent. A sanction of loss of FSA time credits by the Discipline Hearing Officer (DHO) may only be imposed when an inmate is found to have committed a prohibited act. Loss of FTCs cannot be entered as a suspended sanction. See the Program Statement **Inmate Discipline Program**.

(b) *How to appeal loss of FSA Time Credits.* **Inmates may seek review of the loss of earned FSA Time Credits through the Bureau's Administrative Remedy Program (28 CFR part 542).**

(c) *Restoration of FSA Time Credits.* **An inmate who has lost FSA Time Credits under this subpart may have part or all of the FSA Time Credits restored to him or her, on a case-by-case basis, after clear conduct (behavior clear of inmate disciplinary infractions under 28 CFR part 541) for two consecutive risk and needs assessments conducted by the Bureau.**

The authority to restore any portion of the offender's lost FTCs is delegated to the Warden and may not be delegated lower than the Associate Warden level. The inmate may request restoration of FTCs during a regularly scheduled Program Review and only after having maintained clear conduct for two consecutive risk and needs assessments. The Unit Manager will submit a request using BP-A1156, Restoration of Federal Time Credits, along with the unit team's recommendation, through the DHO to the Warden (or designee) for final decision. If the recommendation to restore FTCs is approved, the Unit Manager or Acting Unit Manager will process the restoration approval into the inmate's record and update via Insight or Insight Feedback.

Whether denied or approved, a copy of the decision will be provided to the inmate. If denied, the inmate will be advised that they may reapply for FTC restoration six months from the date of denial, if clear conduct is maintained. A copy will be maintained in the inmate's J&C and electronic inmate central file (e-ICF), with other sentence computation documents.

## 10. APPLICATION OF FTCs

§ 523.44 Application of FSA Time Credits.

(a) *How Time Credits may be applied.* For any inmate eligible to earn FSA Time Credits under this subpart who is:

> (1) Sentenced to a term of imprisonment under the U.S. Code, the Bureau may apply FSA Time Credits toward prerelease custody or supervised release as described in paragraphs (c) and (d) of this section.
> (2) Subject to a final order of removal under immigration laws as defined in 8 U.S.C. 1101(a)(17) (*see* 18 U.S.C. 3632(d)(4)(E)), the Bureau may not apply FSA Time Credits toward prerelease custody or early transfer to supervised release.
> (3) Serving a term of imprisonment pursuant to a conviction for an offense under laws other than the U.S. Code (see Section 105 of the FSA, Pub. L. 115-391, 132 Stat. 5214 (not codified; included as note to 18 U.S.C. 3621)), the Bureau may not apply FSA Time Credits toward prerelease custody or early transfer to supervised release. This paragraph (a)(3) will not bar the application of FSA Time Credits, as authorized by the DC Code, for those serving a term of imprisonment for an offense under the DC Code.

Inmates sentenced under the DC Code can neither earn nor apply FTCs unless and until the DC Council defines eligibility to earn FTCs (i.e., which DC Code offenses, if any, preclude eligibility) and defines the criteria which authorizes the application of FTC (i.e., any circumstances, if any, which preclude application). If and when the earning and application of

FTCs is authorized for inmates sentenced under the DC Code, the unit team will review inmates for eligibility and enter the applicable eligibility assignment into SENTRY. Any retroactive application of FTCs will be made consistent with the authorities granted under the DC Code.

~~While inmates with unresolved pending charges and/or detainers may earn FTCs, if otherwise eligible, they will be unable to apply them to prerelease custody or release to supervision unless the charges and/or detainers are resolved. An inmate with an unresolved immigration status will be treated as if he/she has unresolved pending charges with regard to the application of FTCs.~~

(b) *Consideration for application of FSA Time Credits.* Where otherwise permitted by this subpart, the Bureau may apply FSA Time Credits toward prerelease custody or early transfer to supervised release under 18 U.S.C. 3624(g) only if an eligible inmate has:

(1) Earned FSA Time Credits in an amount that is equal to the remainder of the inmate's imposed term of imprisonment;

(2) Shown through the periodic risk reassessments a demonstrated recidivism risk reduction or maintained a minimum or low recidivism risk, during the term of imprisonment; and

(3) Had the remainder of his or her imposed term of imprisonment computed under applicable law.

(c) *Prerelease custody.* The Bureau may apply earned FSA Time Credits toward prerelease custody only when an eligible inmate has, in addition to satisfying the criteria in paragraph (b) of this section:

(1) Maintained a minimum or low recidivism risk through his or her last two risk and needs assessments; or

(2) Had a petition to be transferred to prerelease custody or supervised release approved by the Warden, after the Warden's determination that:

(i) The prisoner would not be a danger to society if transferred to prerelease custody or supervised release;

(ii) The prisoner has made a good faith effort to lower their recidivism risk through participation in recidivism reduction programs or productive activities; and

(iii) The prisoner is unlikely to recidivate.

To apply FTCs to prerelease placement, an inmate ordinarily must otherwise be eligible to participate in prerelease custody consistent with limitations as outlined in the Program Statement **Community Corrections Center (CCC) Utilization and Transfer Procedure,** ~~separate from any FSA eligibility criteria,~~ and be "opted in" at the time of the referral and be in minimum or low risk status through their last two assessment periods and transfer to prerelease placement.

However, in all cases, earned time credits will be applied to prerelease custody (RRC and/or HC) as required by the First Step Act.

The First Step Act requires that, if an individual meets the criteria outlined in (c)(1), the credits must be applied when the amount of time credits earned is equivalent to remainder of the prisoner's imposed term of imprisonment, consistent with the method for calculation described below. Pre-release placement in a Residential Reentry Center (RRC) or Home Confinement (HC) will be based on FTCs other than those credits already applied to early transfer for supervised release.

~~For inmates with minimum or low risk who have not yet maintained two consecutive assessments, they will need to submit a BP-A0148, Inmates Request to Staff, during their regularly scheduled Program Review in order to have their early application of FTCs considered. The Unit Manager will submit a request, along with the unit team's recommendation, to the Warden (or designee) for final decision.~~

Inmates with high or medium PATTERN recidivism risk levels are exceptions to the routine application of this policy with regard to awarding FTCs toward early transfer to prerelease custody and/or supervised release. The Warden will consult with the Regional Director before approving an inmate under section (c)(2), unless an exemption is granted by the Regional Director consistent with the Program Statement **Directives Management Manual**. Ordinarily, inmates considered inappropriate for early transfer to prerelease custody or supervised release under section (c)(2) include, but are not limited to, inmates who:

- Have a high or medium PATTERN recidivism risk level
- Have a current or prior offense listed in the Program Statement **Categorization of Offenses**. Early transfers for such inmates are considered only in highly unusual circumstances. Ordinarily, an inmate is precluded from receiving an early transfer if he/she has an offense listed in either the Section titled "Offenses categorized as crimes of violence", or the Section titled, "Offenses that at the Director's discretion shall preclude an inmate's receiving certain Bureau program benefits".
- Has a Public Safety Factor (PSF) that the Designation and Sentence Computation Center (DSCC) Administrator has not waived.
- Have a history of community-based supervision (i.e., probation, parole, supervised release, halfway house, home confinement, etc.) non-compliance to include technical violations, escape, absconding/eluding, and/or new criminal conduct.
- Inmates who have been found to have committed 100 OR 200 level prohibited acts during the current term of incarceration, or the prohibited acts of using drugs or alcohol, drug possession, possession of drug paraphernalia, or introduction of drugs into Bureau institutions within the last three years from the date of the incident.

Additionally, inmates with high or medium PATTERN recidivism risk levels must demonstrate a good faith effort to lower their recidivism risk by:

- Maintaining clear conduct for at least three years from the date of the request.
- Successfully completing at least one of the Bureau's residential EBRR programs recommended based on an identified need area within the past five years, if any have been assigned.
- Is otherwise compliant with all the other requirements of this Program Statement with regard to successful program participation.

Inmates may initiate a request under (c)(2) by submitting a BP-A0148, Inmate Request to Staff, during their regularly scheduled Program Review.  The Unit Manager will submit a request, along with the unit team's recommendation, to the Warden (or designee) for final decision.

For Minimum and Low PATTERN risk inmates, consistent with the methodology described in Sections 6 and 7 of this policy, the Bureau will initially estimate an FSA conditional Projected Release Date (PRD) by calculating the maximum number of potential FTC that an inmate may earn during his or her sentence.  The Bureau will make an initial projection based on the inmate's PATTERN risk level. (For inmates currently in custody as of the effective date of this policy, the PATTERN risk level will be presumed to be the current level). This FSA PRD is subject to change during the inmate's incarceration, and it will be adjusted if the inmate's PATTERN score changes or if the inmate enters non-earning status.

FTC will not be applied towards an inmate's release date unless earned. Medium and High PATTERN risk inmates may earn FTC, but will not receive an estimated FSA PRD.

RRC and/or HC referrals will ordinarily be submitted to the respective Residential Reentry Management (RRM) office 12 months in advance of the inmate's PRD or at least 60 days prior to the projected RRC/HC placement date, whichever is greater.  The RRC and/or HC recommendation will include the total number of days recommended based on the Five Factor Review (see 18 U.S.C. § 3621(b)), required under the Second Chance Act, plus the remaining number of FTC days not applied to supervised release at the time of the referral.  When determining the FTC days available to be applied toward RRC/HC placement, the Bureau will assume that the inmate will remain in earning status from the referral date until the transfer to prerelease custody.   There is no expectation the RRC/HC placement date will be modified once the referral has been submitted to the RRM office.

**Once an inmate has been transferred to prerelease custody pursuant to the procedures outlined in this section, the inmate will maintain the recidivism risk level the inmate had at the time of the transfer, unless the inmate benefits from a lower recidivism risk level based**

on the passage of time or the inmate's actions result in a higher risk rating. **If an inmate is removed from prerelease custody for a violation, and is returned to a BOP institution, the inmate's recidivism risk level will be reassessed pursuant to the procedures outlined in Section 5 of this Program Statement.**

Prerelease placement is dependent on, but not limited to, the inmate's release residence, program requirements, and available contract bed space and funding.

**(d) *Transfer to supervised release.* The Bureau may apply FSA Time Credits toward early transfer to supervised release under 18 U.S.C. 3624(g) only when an eligible inmate has, in addition to satisfying the criteria in paragraphs (b) and (c) of this section:**
> **(1) An eligible inmate has maintained a minimum or low recidivism risk through his or her last risk and needs assessment;**
> **(2) An eligible inmate has a term of supervised release after imprisonment included as part of his or her sentence as imposed by the sentencing court; and**
> **(3) The application of FSA Time Credits would result in transfer to supervised release no earlier than 12 months before the date that transfer to supervised release would otherwise have occurred.**

For inmates who meet the following criteria, up to 365 days of earned FTCs will be automatically applied to early release:

- Has a term of supervised release to follow the term of incarceration
- Has a low or minimum PATTERN risk level
- Has maintained a low or minimum PATTERN risk level for at least two consecutive assessments conducted during regularly scheduled Program Reviews
- ~~Has no detainers or pending charges, to include unresolved immigration status and~~
- Is not the subject of a final order of removal under immigration laws, and
- Has not opted out or refused to participate in any required program, and therefore, is in earning status.

As explained in Section 10(b), the Bureau will calculate an inmate's PRD by assuming that an inmate will remain in earning status throughout his or her sentence, including while in prerelease custody. If an inmate on prerelease custody has already earned the maximum 365 days of credit toward supervised release, the PRD will be adjusted only if the inmate loses earned FTCs consistent with Section 9. If an inmate is returned to prison for a violation during prerelease custody or any other reason, their projected FTCs may be adjusted depending on any failure to remain in earning status.

**As used in this Section, "last risk and needs assessment" refers to the final risk and needs**

**assessment conducted while the inmate was at a BOP institution, prior to the inmate's transfer to supervised release or prerelease custody.**

## 11. **RESIDENTIAL DRUG ABUSE TREATMENT PROGRAM EARLY RELEASE BENEFIT AND FTCs**

Inmates who successfully complete the Residential Drug Abuse Treatment Program (RDAP) and are eligible for early release pursuant to 18 U.S.C. § 3621(e) may also earn FTCs which could be applied towards an additional reduction to their Projected Release Date (PRD). Eligibility to apply earned FTCs is separate and unrelated to the eligibility requirements under 3621(e).

An inmate must complete all required components of RDAP, including the community-based treatment component, in order to receive the early release benefit pursuant to 18 U.S.C. § 3621(e). The 3621(e) benefit will be applied first to the inmate's sentence computation, followed by the application of FTCs, however, an inmate must have sufficient time remaining to serve to complete all required components of the RDAP program (i.e., 120-day community-based treatment).

In the event an inmate has insufficient time remaining to serve after completing the RDAP program to receive both the early release benefit under 3621(e) and the full 365 days toward early release of earned FTCs, the number of FTC days applied will be reduced to allow for, at a minimum, the 120-day community-based placement as required under 3621(e).

Regardless of whether the inmate is receiving the 3621(e) release benefit alone or in conjunction with FTCs, the inmate will have a conditional release method entered into SENTRY until the inmate receives a community-based placement date with, at a minimum, the required 120 days and the unit team has submitted a completed BP-A0628, Notification of RRC Placement Date, to the Designation and Sentence Computation Center (DSCC).

Inmates who release early pursuant to section 3621(e) and who also earn FTCs will be keyed with the release method which identifies that both benefits have been applied. The Correctional Systems t intranet page provides a list of FSA release method codes and descriptions for staff.

## 12. ADMINISTRATIVE REMEDIES.

Inmates who wish to seek review of any issue relating to this Program Statement may use the procedures outlined in the Program Statement **Administrative Remedy Program.**

## REFERENCES

*U.S. Codes or Regulations Referenced*
8 U.S.C. § 1101
18 U.S.C. § 3624
18 U.S.C. § 3632
28 C.F.R. § 541
28 C.F.R. § 542

*Program Statements*
1221.66 CN-1   Directives Management Manual (7/21/1998)
1330.18        Administrative Remedy Program (1/6/2014)
5162.05        Categorization of Offenses (3/16/2009)
5200.06        Management of Inmates with Disabilities (11/22/2019)
5220.01        First Step Act Program Incentives (7/14/2021)
5270.09 CN-1   Inmate Discipline Program (11/18/2020)
5322.13        Inmate Classification and Program Review (5/16/2014)
5330.11 CN-1   Psychology Treatment Programs (4/25/2016)
5331.02 CN-2   Early Release Procedures under 18 U.S.C. § 3621(e) (9/27/2017)
5400.01        First Step Act Needs Assessment (6/25/2021)
7310.04 CN-1   Community Corrections Center (CCC) Utilization and Transfer
               Procedure (12/16/1998)

*Forms*
BP-A0148   Inmate Request to Staff
BP-A0628   Notification of RRC Placement Date
BP-A1156   Restoration of Federal Time Credits

*ACA Standards:*
**American Correctional Association Standards for Adult Correctional Institutions - 5th Edition:**
5-ACI-2C-11, 5-ACI-3C-01, 5-ACI-3C-03, 5-ACI-3C-04, 5-ACI-3C-07, 5-ACI-3C-08, 5-ACI-3C-11, 5-ACI-3C-13, 5-ACI-3C-15, 5-ACI-3C-19,
5-ACI-3C-23, 5-ACI-3D-19, 5-ACI-4A-09, 5-ACI-5B-01, 5-ACI-5B-03, 5-ACI-5B-04, 5-ACI-5B-05, 5-ACI-5B-06, 5-ACI—5B-07, 5-ACI-5B-08,
5-ACI-5B-09, 5-ACI-5E-02, 5-ACI-5E-11, 5-ACI-5E-12, 5-ACI-5E-13, 5-ACI-5E-14, 5-ACI-5E-15, 5-ACI-6A-42, 5-ACI-6C-06, 5-ACI-7B-10

**American Correctional Association Performance Based Standards for Adult Local Detention Facilities - 4th Edition:**
4-ALDF-2A-30, 4-ALDF-2A-47, 4-ALDF-2A-50, 4-ALDF-3A-01, 4-ALDF-3A-02, 4-ALDF-

4C-40, 4-ALDF-5A-04, 4-ALDF-5A-08,
4-ALDF-6B-01, 4-ALDF-6B-02, 4-ALDF-6B-04, 4-ALDF-6B-05, 4-ALDF-6B-08, 4-ALDF-6C-01, 4-ALDF-6C-03. 4-ALDF-6C-04, 4-ALDF-6B-07, 4-ALDF-6C-09, 4-ALDF-6C-11, 4-ALDF-6C-12, 4-ALDF-6C-14, 4-ALDF—6C-15, 4-ALDF-6C-18, 4-ALDF-7D-2

*Records Retention Requirements*
Requirements and retention guidance for records and information applicable to this program are available in the Records and Information Disposition Schedule (RIDS) on Sallyport.

EXHIBIT D

# First Step Act Admission and Orientation (A&O) Addendum

The First Step Act (FSA) allows eligible inmates to receive Federal Time Credits (FTCs) for successfully participating in approved Evidence-Based Recidivism Reduction (EBRR) Programs and/or Productive Activities (PAs). These credits can be used toward pre-release, community-based placement and/or toward early release to a Supervised Release Term.

## What is the PATTERN Risk Assessment?

All sentenced inmates, regardless of eligibility status, will be assessed for risk of recidivism and for their needs. The Prisoner Assessment Tool Targeting Estimated Risk and Needs (PATTERN) is the automated recidivism risk assessment tool and part of the Bureau's FSA-approved Risk and Needs Assessment System. The PATTERN tool is completed during the Initial Classification and is used to assign each incoming inmate an initial recidivism risk level of Minimum, Low, Medium, or High. You will receive a General and Violent Risk Level and the higher of the two is your overall Recidivism Risk Level. The resulting recidivism risk level is not to be confused with security or custody level. Risk level is re-assessed at every regularly scheduled program review (commonly called a team meeting) throughout your incarceration with the BOP. Your case manager will discuss your PATTERN results during your Initial Classification and at each team meeting throughout your incarceration.

Your case manager will also provide you a copy of your PATTERN risk assessment worksheet at each team. The worksheet will show your current PATTERN risk scores and level for General and Violent Recidivism Risk as well as your overall Risk Level. The worksheet will also list all your program completions for which you are receiving credit.

In addition to the PATTERN risk assessment being reviewed during regularly scheduled team meetings, it will also be automatically reviewed during the monthly auto-calculation of Federal Time Credits to capture changes in risk level elements since the last team. For example, program completions, clear conduct or sanctioned incident reports, and birthdays (age). While this new automation will allow for changes to be credited closer to their occurrence, it will also ensure that changes are credited for the FSA Assessment. This automation applies to all inmates whether in the institution, pre-release placement, on writ, in-transit, etc.

## What is the SPARC-13 Needs Assessment?

The Standardized Prisoner Assessment for Reduction in Criminality (SPARC-13) is the Bureau's needs assessment system. It is used to assess inmates in 13 need areas to focus recommended **programming to reduce the risk of recidivating. Portions of the SPARC-13 assessment require** the inmate's active participation. **Failure on the inmate's part to complete the self-assessment surveys timely will delay completion and negatively impact the inmate's ability to begin earning FTCs as the inmate will be considered to have "opted out," and therefore will be in non-earning status regardless of eligibility to earn FTCs.**

What does this mean?  **If you do not complete the surveys, which are found on the Trust Fund Limited Inmate Communication System (TRULINCS), you will NOT earn FTCs.**  Do not wait until your Initial Classification to complete the surveys.  The sooner they are completed, the better.  If you are having difficulty finding the surveys, opening them, or understanding the questions, please talk to your unit team.

Based on the results of your initial Needs Assessment, staff from the different departments will make program recommendations to assist you in reducing your risk of recidivism.  Your needs are re-assessed at every regularly scheduled program review meeting throughout your sentence and program recommendations will be adjusted based on changes in your need areas.  Your case manager will discuss your SPARC-13 results as well as the program recommendations during your Initial Classification and at each team meeting throughout your incarceration.

Your case manager will also provide you a copy of your Needs Assessment worksheet at each team.  The worksheet will show your current PATTERN risk scores and level for General and Violent Recidivism Risk as well as your overall Risk Level.  The worksheet will also list all your program completions for which you are receiving credit.

Similar to the monthly automated review of the PATTERN risk assessment, the SPARC-13 Needs Assessment will be automatically reviewed during the monthly auto-calculation of Federal Time Credits to captures changes in your Needs Assessment.

**What are the 13 areas the SPARC-13 Needs Assessment looks at?**

| | | |
|---|---|---|
| Anger/Hostility* | Family/Parenting* | Rec/Leisure/Fitness |
| Anti-Social Peers* | Finance/Poverty | Substance Use |
| Cognition* | Medical | Trauma |
| Dyslexia | Mental Health | Work |
| Education | | |

*Self-Assessment Surveys completed on TRULINCS.  While the completed assessment information is uploaded monthly, you are given credit based on the day you completed the surveys – not the date it was uploaded.

**What is an Evidence-Based Recidivism Reduction (EBRR) Program?**

An EBRR Program is a group or individual activity found in the FSA Approved Programs Guide where research has shown that participation reduces, or is likely to reduce, recidivism.  Some examples of EBRR Programs are:

- GED
- Residential Drug Abuse Program (RDAP)
- Anger Management

- Life Connections
- UNICOR Employment

## What is a Productive Activity (PA)?

A PA is a group or individual activity found in the FSA Approved Programs Guide that enhances skills to address identified needs and allows an inmate to remain productive and thereby maintain, or work toward achieving, a minimum or low risk of recidivating. Some examples of PAs include:

- Alcoholics Anonymous (AA) Support Group
- Bereavement Support Group
- Circle of Strength
- Franklin Covey 7 Habits on the Inside

Inmates are also encouraged to also participate in other available activities that reduce idleness and contribute to an inmate's overall positive institutional adjustment and help maintain clear institution conduct. Some examples include:

- Productive, free-time activities (e.g., recreation, hobby crafts, or religious services)
- Family interaction activities (e.g., social visiting)
- Personal growth and development classes (e.g., adult continuing education classes)
- Institution work program
- Community service projects

## What is an FSA Assessment and when does it occur?

The FSA Assessment brings everything together: PATTERN, SPARC-13, and EBRR/PA program participation. The FSA Assessments are independent, automated, and coincide with the Initial Classification and Program Review timeline. This means the initial FSA Assessment occurs 28 days after your arrival at your designated facility. Subsequent FSA Re-Assessments occur every 180 days, if you are more than 12 months from your projected release date, and every 90 days, if you are under 12 months from release.

Because FSA Assessments are automated, this means if your team meeting is late because your case manager is out sick or you miss it because you're out on writ or in-transit to another facility, your FSA Assessment will occur based on the most recent information in your record. And, with the enhanced automation in the PATTERN and SPARC-13 tools, those will also be updated even if you're not in your institution, or if your case manager is out sick.

## Who is NOT eligible to earn FTCs?

- U. S. Code Inmates convicted of offenses excluded by the FSA
- U. S. Code Inmates with prior state or federal convictions excluded by the FSA
- U. S. Code, Old Law Inmates

- U. S. Code Inmates in state custody
- State boarders
- Treaty Transfers Inmates
- Military Inmates
- D. C. Code Inmates*

Your case manager will discuss your eligibility status during your Initial Classification. If you believe you are eligible, ask your case manager which offense and/or sentence makes you ineligible to earn time credits. Remember your ineligibility is based on either your conviction and/or your court of jurisdiction.

*D. C. Code inmates: In late Spring 2023, the D. C. Government passed statute which would allow eligible individuals to earn time credits. Unfortunately, the statute, as passed, did not provide the same level of detail and structure which was included in the Federal statute. Currently, the Bureau is working with the D. C. Government to determine eligibility criteria to earn and apply credit. As more information becomes available, it will be distributed.

**What if I have consecutive charges and one of them is on the disqualifying list, but the other isn't; will I earn credits?**

The short answer is no. Whether you have multiple counts, multiple J & Cs, and/or multiple jurisdictions, you are serving a single, aggregated term of incarceration. The review for eligibility is based on your term of incarceration. You are either eligible or you are not. This means if one count, one J & C, or one jurisdiction is ineligible to earn time credits, then your term of incarceration is ineligible.

Also, if you are convicted for new criminal conduct while serving your sentence, whether your sentence is run concurrently or consecutively, and if the new conviction is for an ineligible offense, the whole term of incarceration becomes ineligible for earning FTCs. For example, USC 18 § 1791, Providing or Possessing Contraband in Prison (weapon, cell phone, tobacco, alcohol, etc.) is a disqualifying offense. Even if you only received a short sentence of a few months, it will disqualify you from being able to earn credit or apply any credit you may have already earned.

**When do I start earning FTCs?**

You will earn your first FTCs once you complete 30 programming days. You can start earning programming days AFTER you arrive at your designated institution, your PATTERN Risk Assessment and SPARC-13 Needs Assessment are completed, and you agree to participate in recommended programming. This means you cannot begin earning programming days and time credits while in pretrial or holdover status, even if you are being held in one of the Bureau's Detention Centers or Jail Units. The reason is simple, the FSA Assessment process begins after you arrive at your designated facility and begin the intake and Initial Classification process.

The only thing which will delay you accumulating programming days is not completing the self-assessment surveys on TRULINCS or refusing to complete the Trauma or Dyslexia Need Assessments. Those elements of the FSA Assessment which are completed by staff have no impact on your ability to accumulate programming days. This means whether your Initial Classification is completed days after your arrival or not until day 27, you will still begin accumulating programming days as soon as you complete the four self-assessment surveys.

**What if I'm back in prison and had FTCs I didn't get to use before I released last time?**

Credits can only be earned and used during your current term of incarceration. Once you are released from your current term, time credits cease to exist. If you return to custody, you start over.

**If I'm eligible to earn FTCs, do I earn FTCs the whole time I'm in prison?**

Not necessarily. There are situations where an inmate is unable or unwilling to participate in programming, and therefore, will not earn FTCs. Those situations include:

- Disciplinary Segregation
- Designation outside the Institution (outside hospital, furlough, etc.) *
- Temporary Transfer to another Federal or a non-Federal agency (Fed Writ, State Writ, IAD, etc.) *
- Placement on a Mental Health/Psychiatric Hold
- Detention as a material witness or for civil contempt
- Placement in civil commitment
- Opting Out (see definition below)
- Refusal to participate in required programs (e.g. Inmate Financial Responsibility (FRP), Drug Education, Second Chance RRC placement, etc.)

*Any part of a day, is considered a day. Therefore, if you are at your designated facility for some portion of the day, you will still be given credit for that day. Remember, you have to accumulate 30 programming days to earn FTCs. This means, for example, if you are admitted to an outside hospital on a Friday and return to the institution on Monday. You are losing two programming days (Saturday and Sunday) – not Time Credits.

**How many FTC days can I earn?**

The number of FTCs earned is based on the length of your incarceration and your total number of programming days. The statute limits the number of earned time credits to "an amount that is equal to the remainder of the prisoner's imposed term of imprisonment." What does this mean? You can only apply time credit up to the amount of time remaining to serve. If for example, you have earned 310 days of time credits toward early release and then receive a sentence reduction which creates a new statutory release date which is only 9 months away (approximately 270 days), your FTCs will be applied to the new date; you will be an immediate release, and the 40 days left over will just disappear

with your release.

**What is "Opting Out?"**

You are opting out if you refuse to participate in or complete any EBRR programs or structured, curriculum-based PAs recommended based on an identified need. You are also considered to be opting out if you refuse to participate in or fail to complete any portion of the Standardized Prisoner Assessment for Reduction in Criminality (SPARC-13), the Bureau's Needs Assessment system.

Based on the results of your Needs Assessment, staff will recommend you participate in EBRR programs and/or PAs to address your needs. If you decline to participate in an EBRR program or PA which has been recommended based on a specific identified needs area, you will be considered opted out, and therefore, in non-earning status regardless of eligibility to earn FTCs.

**Can I earn FTCs while waiting for a program?**

Yes. You will remain in FTC earning status while on a waitlist for EBRR programs or PAs recommended based on your needs assessment if you have not refused to participate. However, if you later refuse to participate in the recommended EBRR program or PA for which you were on a waitlist, you will be considered declined, or opted out, for the entire waitlist period.

The waitlist period is defined in terms of the corresponding need area(s). When an inmate declines participation after being on a waitlist, the auto-calculation application will first identify any need areas associated with the declined program and then identify the oldest waitlist associated with the need area(s). Any credits earned since the oldest waitlist associated with the need area, without intervening participation, will be rescinded to reflect the inmate's refusal. This means that any credits earned during the waitlist period will be removed to reflect your refusal/opting out.

**How do I earn my credit?**

FTCs are awarded based your eligibility to earn credit, completion of the PATTERN and SPARC-13 assessments, and ongoing participation in programs designed to reduce the risk of recidivating. Once you are in earning status, you will remain in earning status unless or until your status changes as previously described.

FTCs are auto-calculated based on 30-day periods in earning status – meaning for every 30 days you are in earning status, you will earn either 10 or 15 days based on your PATTERN risk level at the time of your FSA Assessment. FTCs will be posted on a monthly basis, agency-wide, based on a completed 30-day period. There is no partial or prorated credit for either programming days or FTCs. No FTCs will post if you have not accumulated 30 days in earning status. Rather, those days in FTC earning status will carry over to the next monthly cycle, and you will receive your FTCs at the end of the next cycle.

For example: If the first monthly posting of FTCs occurs only five days after you go into earning status, no FTCs will post to your record as you have not yet accumulated 30 days in earning status. However, those five days will carry over to the next monthly cycle, and you will receive the FTCs at the end of the second month. If later, you go into FRP Refuse or decline a recommended needs-related program and go into opt out status, you will no longer be in earning status, and therefore, you will stop accruing days toward FTCs and no FTCs will post to your record. Once you return to earning status, you will resume accruing days toward the earning of FTCs.

Along with other enhancements to the FSA Assessment process, beginning later in 2023, your Time Credit status will also be reviewed during regularly scheduled Program Review meetings which will allow you additional opportunities to catch up the "carried over" programming days and post Time Credits to your record sooner.

**How will I know how much credit I've earned?**

At each team, you will receive a copy of the Federal Time Credits Worksheet. This worksheet will include, among other things:

- FTC days earned toward early release and toward RRC/HC placement
- Number of accrued and disallowed programming days
- Whether you are eligible to apply credits toward release, and if not eligible, the reason
- Accruing and disallowing time frames, total number of days, and reasons for disallowances
- FSA Assessment and the Recidivism Risk Level at the time of the Assessment
- FTC Earning Rate

Later in 2023 and into 2024, the FSA Time Credit Worksheet will be enhanced to provide additional information as well as improving the clarity of the information provided.

**How do I earn 15 days of credit instead of 10 days?**

Whether you earn 10 or 15 days of FTCs depends on your PATTERN Recidivism Risk level at the time of the FSA Assessment. All eligible inmates will earn 10 FTC for every 30 days in earning status. Once an inmate has maintained Low or Minimum risk for two consecutive FSA Assessments, the inmate can begin earning 15 FTCs for every 30 days in earning status.

**Can I lose FTCs?**

**Yes. You can be sanctioned to Loss of FTCs by the Disciplinary Hearing Officer** (DHO) for an incident report. However, you can appeal the loss through the Administrative Remedy Process. More importantly, you can request to have those lost FTC days be restored or given back **AFTER** you have maintained clear conduct for two consecutive FSA Assessments.

**If I lost FTCs because I refused to take a recommended program, can I get those days restored?**

You didn't lose FTCs because you refused a recommended program, you lost programming days which resulted in you not earning FTCs. Because you never earned the FTC days to start with, there is nothing to restore. Remember, if you decline a recommended program, you are "opting out" and therefore are in a non-earning status.

**Once I earn FTCs, how do I get to use them?**

FTCs are used two ways – early transfer to prelease custody (halfway house or home confinement) or early release to your Supervised Release term. If eligible, the first 365 days of FTCs will be applied to your early transfer to your Supervised Release term resulting in an early release from prison. Any remaining FTCs are applied to pre-release custody resulting in your ability to transfer to halfway house or home confinement sooner than you would have without the credit.

**Does everyone get to use their FTCs or are there restrictions?**

No – not everyone will get to use the FTC days earned. There are limitations. For an inmate to have up to 365 days of earned FTCs automatically applied to early release, an inmate must meet the following criteria:

- Have a term of Supervised Release to follow the term of incarceration
- Have a low or minimum PATTERN risk level
- Have not opted out or refused to participate in any required program, and therefore, be in earning status

Credit earned in excess of 365 days is applied toward increased pre-release placement in halfway house or home confinement.

**If I don't have Supervised Release to follow, do I still get to use my FTCs?**

Yes, but they can only be applied to pre-release custody.

**What if I am High or Medium Risk? Can I apply the time credits I've earned?**

Maybe. If you are High or Medium Risk but have maintained clear conduct and participated in all the recommended programming, you may be able to apply the credits you've earned by petitioning the Warden. In determining whether to approve your petition, the Warden will consider the following:

- Whether you would not be a danger to society if transferred to prerelease custody or supervised release;
- Whether you have made a good faith effort to lower your recidivism risk through participation in recidivism reduction programs or productive activities, and
- Whether you are unlikely to recidivate.

How will you demonstrate this to the Warden?  By maintaining clear conduct and by participating in the EBRRs and PAs recommended to address your specific Needs.  Will maintaining clear conduct and participating in programming automatically mean you will be approved?  No.  Each case is reviewed individually considering both your history and your time in prison.  But, if you haven't maintained clear conduct for an extended period time and/or haven't completed programming, you shouldn't be surprised if your petition is denied.

## How do I petition the Warden to apply my Time Credits if I am High or Medium Risk?

Submit an Inmate Request to Staff Member (copout) to your unit team during your regularly schedule Program Review team meeting.  The unit team will review your record and make a recommendation to the Warden.  The Warden, after reviewing your record and consulting with the Regional Director, will either approve or deny your petition.  You will receive a written response from the Warden to your request.  During all aspects of this program, you may file an Administrative Remedy if you choose.

## Are FTCs applied to my percentage of time served?

No.  FTCs applied toward your release date do NOT impact your percentage of time served because FTCs do not change your Statutory Release Date – they only change your Satisfaction Date.

## What is an FSA Conditional Release Date?

For eligible inmates who are Low or Minimum Risk, this is a presumed earliest release date you could earn with Federal Time Credits.  This calculation makes the presumption that once you are Low or Minimum risk AND in earning status, you will continue to remain in earning status.  As a reminder, the FSA Conditional Date, is **NOT** your release date as the credit is only applied as it is earned.  <u>Changes in your status (e.g., FRP Refuse, program declines, Disciplinary Segregation, etc.) will result in changes in your conditional date.  **The FSA Conditional Release Date is for planning purposes only.**</u>

Additionally, a second application will project the maximum number of FTCs which can be earned during your term of incarceration.  This will assist in determining the earliest eligible pre-release placement date.  This means your Unit Team will be able to monitor your projected number of FTCs and submit your RRC referral timely.  Remember this is still just a planning tool, if your status changes, the possible maximum number of FTC days will change as well.

## Do I earn FTCs while in Halfway and/or Home Confinement?

Yes.  As long as you continue to successfully program.  Remember incident reports can result in a change in your PATTERN Risk Level.  If this happens while in Halfway House and/or Home Confinement, it can also impact both your earning status and your ability to apply FTCs toward your release.  If your PATTERN Risk Level increases to Medium or High Risk for any reason, you will no longer be eligible to apply your FTCs, and may be removed from pre-release placement and returned to the institution.

## How does FTCs work with Pre-Release Placement?

Your halfway house and/or home confinement recommendation will include the total number of days recommended under the Second Chance Act, plus the remaining number of FTC days not applied to Supervised Release at the time of the referral.

**Do FTCs change my Home Confinement Eligibility Date (HCED)?**

Yes and no.  Your Home Confinement Eligibility Date is calculated based on your statutory term. FTCs do not impact the number of days making up the eligibility date – that block of days is the same regardless of FTCs earned.  What changes is the date itself.  This is because the eligibility date is based on the number of days prior to Projected Release Date, and as your release date changes (due to earned FTCs), the Home Confinement Eligibility Date also changes, but the block of days making up the statutory Home Confinement does not.  Plus, once you earn FTCs toward early pre-release placement, the Home Confinement Eligibility Date is based on that same block of days, but in advance of the maximum number of FTCs earned.



For example, if you had 30 months to serve (after Good Conduct Time) and had a minimum or low Risk level from the beginning, you could earn up to 415 FTCs.  You would also have a Home Confinement Eligibility Date of about 90 days.  The first 365 FTCs are applied toward release, leaving you about 18 months to serve.  If your unit team also recommended you for a 120-day prerelease placement under the Second Chance Act, that would be added to the 50 FTC days remaining for all total recommended pre-release placement of 170 days.  But, because the Second Chance Act Placement is served first to include the 90-day Home Confinement Eligibility, you would have to serve at least 30 of your 120-day Second Chance Act placement in the halfway house before you could transfer to home confinement.

**How do unresolving pending charges and/or detainers impact me getting Time Credit?**

As long as you are eligible to earn time credits, an unresolved pending charge and/or detainer has no impact.  With the exception of inmates with final orders of deportation or removal – determinations made based on documentation provided by Immigration and Custom Enforcement (ICE), unresolved pending charges and/or detainers will not impact your ability to apply credit toward early release or pre-release placement.

However, it is important to understand that while you are eligible for halfway house and/or home confinement, placement in the community does NOT eliminate the outstanding detainers and/or pending charges.  **Meaning - if you are in halfway house and/or home confinement and have detainers and/or pending charges, you are at significantly higher risk to be arrested due to active**

warrants, and an arrest will result in a technical escape for you and an interruption in your federal sentence as the Bureau will have lost primary jurisdiction.

Because you are not eligible for a needs-based recommendation under the Second Chance Act, your FSA placement in halfway or home confinement is VOLUNTARY.  You can decline the voluntary FSA placement without any negative impact.  This means you can still apply your FTCs, up to 365 days, toward early release.  Please let your case manager know if you are declining the voluntary FSA placement due to unresolved pending charges or detainers in pre-release custody.

**Can I still earn FTCs if I'm eligible to receive the Residential Drug Abuse Program Early Release Benefit?**

Yes, but the Residential Drug Abuse Program (RDAP) Early Release Benefit is applied first to your release date, then any FTC days are applied afterwards.  This means you must complete all components of RDAP, to include the community-based portion – a minimum of 120-days in the community-based treatment program.

To receive the full benefit of both programs, you must have enough time remaining to complete all required components of RDAP.  In the event you do not have enough time remaining after completing the RDAP program to receive both, the number of FTC days applied will be reduced to allow for, at a minimum, the 120-day community-based placement as required under 3621(e).

**Questions?**

If you have questions about any aspect the First Step Act or the associated Federal Time Credits, including eligibility, requirements, or limitations, and/or programs, please talk to your unit team.  They will either be able to answer your question or direct you to staff in the department that can assist you.

EXHIBIT E

## FSA Time Credit Assessment

Register Number:51349-039, Last Name:JUNOD

**U.S. DEPARTMENT OF JUSTICE**                                      **FEDERAL BUREAU OF PRISONS**

| | |
|---|---|
| Register Number....: 51349-039 | Responsible Facility: MIL |
| Inmate Name | Assessment Date.....: 09-03-2024 |
|   Last.............: JUNOD | Period Start/Stop...: 12-21-2018 to 09-03-2024 |
|   First............: ERIC | Accrued Pgm Days....: 2083 |
|   Middle...........: | Disallowed Pgm Days.: 0 |
|   Suffix...........: | FTC Towards RRC/HC..: 640 |
| Gender...........: MALE | FTC Towards Release.: 365 |
| Start Incarceration: 05-15-2017 | Apply FTC to Release: Yes |

| Start | Stop | Pgm Status | Pgm Days |
|---|---|---|---|
| 12-21-2018 | 07-17-2019 | accrue | 208 |

  Accrued Pgm Days...: 208
  Carry Over Pgm Days: 0
  Time Credit Factor.: 10
  Time Credits.......: 60

-----------------------------------------------------------------------

| Start | Stop | Pgm Status | Pgm Days |
|---|---|---|---|
| 07-17-2019 | 09-03-2024 | accrue | 1875 |

  Accrued Pgm Days...: 1875
  Carry Over Pgm Days: 28
  Time Credit Factor.: 15
  Time Credits.......: 945

--- FSA Assessment ------------------------------------------------------

| # | Start | Stop | Status | Risk Assignment | Risk Asn Start | | Factor |
|---|---|---|---|---|---|---|---|
| 001 | 12-21-2018 | 01-18-2019 | ACTUAL | FSA R-LW | 04-28-2021 | 1136 | 10 |
| 002 | 01-18-2019 | 07-17-2019 | ACTUAL | FSA R-LW | 04-28-2021 | 1136 | 10 |
| 003 | 07-17-2019 | 01-13-2020 | ACTUAL | FSA R-LW | 04-28-2021 | 1136 | 15 |
| 004 | 01-13-2020 | 07-11-2020 | ACTUAL | FSA R-LW | 04-28-2021 | 1136 | 15 |
| 005 | 07-11-2020 | 01-07-2021 | ACTUAL | FSA R-LW | 04-28-2021 | 1136 | 15 |
| 006 | 01-07-2021 | 07-06-2021 | ACTUAL | FSA R-LW | 04-28-2021 | 1136 | 15 |
| 007 | 07-06-2021 | 01-02-2022 | ACTUAL | FSA R-LW | 04-28-2021 | 1136 | 15 |
| 008 | 01-02-2022 | 07-01-2022 | ACTUAL | FSA R-LW | 11-04-2021 | 0809 | 15 |
| 009 | 07-01-2022 | 12-28-2022 | ACTUAL | FSA R-LW | 04-21-2022 | 0900 | 15 |
| 010 | 12-28-2022 | 06-26-2023 | ACTUAL | FSA R-LW | 10-06-2022 | 0710 | 15 |
| 011 | 06-26-2023 | 12-23-2023 | ACTUAL | FSA R-LW | 03-30-2023 | 0906 | 15 |
| 012 | 12-23-2023 | 06-20-2024 | ACTUAL | FSA R-LW | 09-21-2023 | 0739 | 15 |
| 013 | 06-20-2024 | 12-17-2024 | ACTUAL | FSA R-LW | 03-14-2024 | 0615 | 15 |

--- Planning ------------------------------------------------------------

Projected Release Date: 05-29-2028
Projected Release Method: GCT REL
~~FSA Projected Release Date: 05-29-2027~~

## FSA Time Credit Assessment

Register Number:51349-039, Last Name:JUNOD

U.S. DEPARTMENT OF JUSTICE                    FEDERAL BUREAU OF PRISONS

FSA Projected Release Method: FSA REL
FSA Conditional Release Date: 05-30-2027
FSA Conditional Placement Days: 1135
FSA Conditional Placement Date: 04-20-2024
SCA Proposed Placement Days: N/A
SCA Proposed Placement Date: N/A

EXHIBIT F

---

**ALPHONSO WOODLEY, Petitioner, v. Warden, USP Leavenworth, Respondent.**
**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS**
**2024 U.S. Dist. LEXIS 87521**
**Case No. 24-3053-JWL**
**May 15, 2024, Decided**
**May 15, 2024, Filed**

---

**Counsel**            {2024 U.S. Dist. LEXIS 1}Alphonso Woodley, Petitioner, Pro se, Leavenworth, KS.

For (fnu) (lnu), Warden, USP-Leavenworth, Respondent: Brian E. Vanorsby, LEAD ATTORNEY, Office of United States Attorney - Wichita, Wichita, KS.

**Judges:** Hon. John W. Lungstrum, United States District Judge.

**Opinion**

**Opinion by:**          John W. Lungstrum

**Opinion**

### MEMORANDUM AND ORDER

Petitioner has filed a *pro se* petition for habeas corpus under 28 U.S.C. § 2241, in which he claims that he is entitled to immediate transfer to prerelease custody. The Court ordered briefing on an expedited basis, respondent has filed an answer, and petitioner has filed a reply brief, and the matter is thus ripe for ruling. For the reasons set forth below, the Court **grants** the petition, and respondent is ordered to effect petitioner's transfer to prerelease custody within 30 days of the date hereof.1

Habeas corpus review is available under Section 2241 if a prisoner is in custody in violation of the Constitution or federal law. *See* 28 U.S.C. § 2241(c)(3). In this case, petitioner claims that respondent and the Bureau of Prisons (BOP) have violated the governing federal statutes by failing to effect his immediate transfer to prerelease custody.

Respondent first argues that petitioner has failed to exhaust his administrative remedies{2024 U.S. Dist. LEXIS 2} as required. Petitioner concedes that he has not completed the BOP's usual four-step administrative process. He argues nonetheless that exhaustion should not be required in his case because of futility, based on the following facts: the regional BOP authority has taken over his prison, which has therefore been on lockdown, and the necessary forms are not available; he followed the instructions of BOP personnel in attempting to submit a "sensitive" claim by BP-10 form directly to the regional office, to bypass two administrative steps; and it would take 120 days or more to use the four-step procedure to address his claim that he is entitled to immediate transfer.

Petitioner is correct that "[a] narrow exception to the exhaustion requirement applies if a petitioner can demonstrate that exhaustion is futile." *See Garza v. Davis*, 596 F.3d 1198, 1203 (10th Cir. 2010). As a general rule, the futility exception is not satisfied merely because exhaustion could not be

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

51349039

completed by the release date that would apply if a petitioner received the claimed credits, *see Randolph v. Hudson*, 2022 U.S. Dist. LEXIS 100036, 2022 WL 1909051, at *1-3 (D. Kan. June 3, 2022) (Lungstrum, J.), or because the petitioner may lose time in a residential reentry center, *see Garner v. United States*, 2021 U.S. Dist. LEXIS 163368, 2021 WL 3856618, at *3 (D. Kan. Aug. 30, 2021) (Lungstrum, J.). In this case, however, respondent has not disputed the facts asserted**{2024 U.S. Dist. LEXIS 3}** by petitioner, particularly the fact that the necessary forms for exhausting are not available.2 In addition, the regional office has already rejected petitioner's claim, even though, as discussed below, the applicable statutes require petitioner's immediate transfer to prerelease custody. Accordingly, the Court finds that exhaustion would be futile in this case, and it will not dismiss the petition on that basis.

Respondent has conceded the following facts. Petitioner was sentenced to a term of imprisonment of 120 months, with 60 months of supervised release, after his conviction for a drug conspiracy offense. Based on projected good conduct time, petitioner would have a statutory release date of April 8, 2027; but because of the application of Earned Time Credits (ETCs) under the First Step Act (FSA) and because of petitioner's completion in December 2023 of a Residential Drug Abuse Treatment Program (RDAP), his projected release date is now April 8, 2025. The BOP has applied 365 days of ETCs toward petitioner's release date, and 445 days of ETCs toward time in a residential reentry center (RRC). Petitioner is eligible at present for placement in an RRC, and the BOP has notified petitioner**{2024 U.S. Dist. LEXIS 4}** that he will be placed in an RRC in Tampa (his release location) on September 4, 2024. According to respondent and the BOP, a placement to an RRC is made to the extent that resources and bed space permit, and that such placement is not required if there is no space available.

In response to the petition, respondent argues that the place of petitioner's confinement falls within the BOP's discretion, with which this Court has no authority to interfere. Respondent argues that two statutes apply here. First, 18 U.S.C. § 3624(b) grants the BOP the authority to designate the place of a prisoner's confinement and to transfer a prisoner to a different facility. *See id.* That statute also provides that "a designation of a place of imprisonment under this subsection is not reviewable by any court." *See id.* Second, the transfer of a prisoner to prerelease custody is addressed in 18 U.S.C. § 3624. Subsection 3624(c) includes the following relevant provisions:

**(1) In general.** - The Director of the Bureau of Prisons shall, to the extent practicable, ensure that a prisoner serving a term of imprisonment spends a portion of the final months of that term (not to exceed 12 months), under conditions that will afford that prisoner a reasonable opportunity**{2024 U.S. Dist. LEXIS 5}** to adjust to and prepare for the reentry of that prisoner into the community. Such conditions may include a community correctional facility [such as an RRC].

**(2) Home confinement authority.** - The authority under this subsection may be used to place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months. The Bureau of Prisons shall, to the extent practicable, place prisoners with lower risk levels and lower needs on home confinement for the maximum amount of time permitted under this paragraph.

. . .

**(4) No limitations.** - Nothing in this subsection shall be construed to limit or restrict the authority of the Director of the Bureau of Prisons under section 3621. . . . .*See id.* § 3624(c). In addition, Section 3624(g) discusses options for certain eligible prisoners who have earned ETCs under the FSA. *See id.* § 3624(g). Such prisoners "shall be placed in prerelease custody" according to certain conditions, with the options including home confinement and placement in an RRC. *See id.* § 3624(g)(1), (2). That subsection also provides that the BOP "may transfer [such eligible]

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

51349039

prisoner to begin any such term of supervised release at an earlier date, not to exceed 12 months, based on the application{**2024 U.S. Dist. LEXIS 6**} of [ETCs] under section 3632." *See id.* § 3624(g)(3).

Respondent is correct that those statutes, by themselves, do not require the BOP to transfer a prisoner to prerelease custody (for instance, at an RRC) as soon as that prisoner is eligible for such placement, for the maximum allowable period of prerelease custody. Rather, Section 3624 provides that the BOP must, to the extent practicable, ensure that a prisoner spends "a portion" of his final 12 months under conditions that will prepare the prisoner for reentry into the community.

Respondent has not addressed the provisions of the FSA set forth in 18 U.S.C. § 3632, however, and the fact that petitioner has earned ETCs. Section 3632(d) provides that prisoners shall earn ETCs based on participation in evidence-based recidivism reduction (EBRR) programming. *See id.* § 3632(d)(4). After describing how such ETCs may be earned, the FSA provides as follows:

> **(C) Application of time credits toward prerelease custody or supervised release.** - Time credits earned under this paragraph by prisoners who successfully participate in recidivism reduction programs or productive activities shall be applied toward time in prerelease custody or supervised release. The Director of the Bureau of Prisons shall transfer eligible prisoners,{**2024 U.S. Dist. LEXIS 7**} as determined under section 3624(g), into prerelease custody or supervised release. *See id.* § 3632(d)(4)(C). Under a plain reading of this provision of the FSA, which includes the word "shall", the BOP is *required* to transfer a prisoner to prerelease custody or supervised release if the prisoner is "eligible" as determined under Subsection 3624(g). Under Section 3624(g), a prisoner is "eligible" if the prisoner has earned ETCs in an amount equal to the remainder of the prisoner's term of imprisonment, which remainder amount has been computed, and the prisoner has met certain benchmarks for the assessed risk of recidivism. *See id.* § 3624(g)(1). Respondent has conceded that petitioner is eligible for placement in prerelease custody. Accordingly, the FSA requires the BOP to place petitioner in prerelease custody.

Respondent's excuse for delaying petitioner's transfer to an RRC is that bed space is not available in a particular RRC until September. No such condition concerning bed availability is included among the requirements for eligibility under Section 3624(g), however, and thus immediate placement in prerelease custody is nevertheless required under Section 3632(d)(4)(C).3 As noted above, that statute uses the mandatory "shall" (as distinguished, for instance, from the provision in Section 3624(g)(3) that the{**2024 U.S. Dist. LEXIS 8**} BOP "may" transfer a prisoner to early supervised release). Numerous courts have held that the BOP has no discretion to delay or refuse transfer of an eligible prisoner to prerelease custody, which transfer is mandatory. *See, e.g., Doe v. Federal Bur. of Prisons*, 2024 U.S. Dist. LEXIS 19755, 2024 WL 455309, at *1-4 (S.D.N.Y. Feb. 5, 2024) (transfer to prerelease custody was required despite the prisoner's participation in the witness protection program); *Ramirez v. Phillips*, 2023 U.S. Dist. LEXIS 228778, 2023 WL 8878993, at *4 (E.D. Cal. Dec. 22, 2023) (agreeing with interpretation that transfer to prerelease custody is mandatory, BOP has no discretion not to transfer); *Komando v. Luna*, 2023 U.S. Dist. LEXIS 11477, 2023 WL 310580, at *4-8 (D.N.H. Jan. 13, 2023) (transfer to prerelease custody was required despite outstanding detainer; rejecting argument that the BOP had discretion to determine which prisoners were suitable for placement in prerelease custody), *report and recommendation adopted*, 2023 U.S. Dist. LEXIS 19054, 2023 WL 1782034 (Feb. 6, 2023); *Sierra v. Jacquez*, 2022 U.S. Dist. LEXIS 234525, 2022 WL 18046701, at *4 (W.D. Wash. Dec. 27, 2022) (transfer to prerelease custody required despite immigration detainer, rejecting argument for discretion), *report and recommendation adopted*, 2023 U.S. Dist. LEXIS 6938, 2023 WL 184225 (Jan. 13, 2023); *Jones v. Engleman*, 2022 U.S. Dist. LEXIS 185635, 2022 WL 6563744, at *9-13 (C.D. Cal. Sept. 7, 2022) (transfer to prerelease custody was mandatory despite pending charges and argument that the prisoner was a flight risk), *report and*

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

51349039

*recommendation adopted in relevant part*, 2022 U.S. Dist. LEXIS 185029, 2022 WL 6445565 (Oct. 7, 2022).4

Respondent has not addressed this authority or cited any contrary authority, and the Court is not aware of any court that has interpreted the mandatory language of **{2024 U.S. Dist. LEXIS 9}** Section 3632(d)(4)(C) in any other way. Respondent relies on a prior decision in which this Court stated that a prisoner has no constitutional right to be placed in a particular facility and that the BOP has exclusive authority and discretion to designate the place of confinement. *See Lee v. English*, 2019 U.S. Dist. LEXIS 139767, 2019 WL 3891147, at *9-10 (D. Kan. Aug. 19, 2019) (Lungstrum, J.), *aff'd sub nom. Jones v. English*, 817 F. App'x 580 (10th Cir. 2020). There is no indication that the prisoner in that case was an eligible prisoner who had earned ETCs, however, and neither this Court nor the Tenth Circuit addressed the applicability of Section 3632(d)(4)(C) in that case. *See id.; Jones*, 817 F. App'x 580. In this case, it is clear that the BOP has no discretion to refuse or delay the transfer of petitioner to prerelease custody.5

Finally, the Court notes that respondent has argued that petitioner's transfer to a particular RRC was scheduled for the future based on bed availability. Respondent has not argued or provided evidence, however, that there is no available space for petitioner in any RRC, or that his immediate transfer to prerelease custody cannot be accomplished. In this regard, the Court notes that while the FSA requires transfer to prerelease custody, the BOP retains the discretion to decide whether to transfer petitioner to an RRC or to home confinement, or even whether **{2024 U.S. Dist. LEXIS 10}** to transfer petitioner to early supervised release. *See Ramirez*, 2023 U.S. Dist. LEXIS 228778, 2023 WL 8878993, at *4; *Komando*, 2023 U.S. Dist. LEXIS 11477, 2023 WL 310580, at *6. Nor does the Court require that petitioner be placed in any particular RRC; thus, the BOP retains the discretion to choose the particular prerelease facility. The Court notes, however, that Section 3624(g) requires the BOP to "ensure there is sufficient prerelease custody capacity to accommodate all eligible prisoners." *See* 18 U.S.C. § 3624(g)(11); *Doe*, 2024 U.S. Dist. LEXIS 19755, 2024 WL 455309, at *4.

Accordingly, because the BOP's failure to transfer petitioner to prerelease custody violates federal law, the Court grants the petition for relief. Respondent and the BOP are ordered to effect such a transfer.

IT IS THEREFFORE ORDERED BY THE COURT THAT the petition for habeas corpus under 28 U.S.C. § 2241 is hereby **granted**, and respondent is ordered to effect petitioner's transfer to prerelease custody within 30 days of the date hereof.

IT IS SO ORDERED.

Dated this 15th day of May, 2024, in Kansas City, Kansas.

/s/ John W. Lungstrum

Hon. John W. Lungstrum

United States District Judge

### Footnotes

1

In addition, the Court in its discretion **grants** petitioner's motion to file a handwritten petition (Doc. # 2), for the reasons argued by petitioner (the proper form was not available and he was seeking an expedited ruling); because his handwritten petition included the same information required by the

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

51349039

form; and because respondent did not oppose the motion. With his traverse, petitioner sought leave to file that brief out of time, but that motion is **denied as moot**, as the Court previously granted petitioner an extension of time until May 17, 2024, to file the traverse.
2

Petition asserted these facts in his motion to file a handwritten petition, which was filed before respondent's answer.
3

The applicable provisions requiring transfer to prerelease custody of eligible prisoners who have earned ETCs are thus distinguished from the provisions of Section 3624(c), which include the qualifying language "to the extent practicable." No such qualifying language is found in the mandate of Section 3632(d)(4)(C) or the eligibility requirements of Section 3624(g)(1).
4

Because the statute is clear that transfer to prerelease custody is mandatory, any contrary interpretation by the BOP (had it offered one) would not be entitled to any deference. *See Komando*, 2023 U.S. Dist. LEXIS 11477, 2023 WL 310580, at *7-8; *Jones*, 2022 U.S. Dist. LEXIS 185635, 2022 WL 6563744, at *9.
5

In *Jones*, the Tenth Circuit noted that although a transfer to an RRC affects the conditions of confinement, not its duration, it had allowed prisoners to challenge by habeas petition under Section 2241 whether the BOP had followed the law in evaluating whether to approve such a transfer. Here, the Court has determined that the BOP did not follow the law with respect to its transfer decision involving petitioner; thus, the Court has determined that habeas relief is appropriate.

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

51349039

ERIC DIXSON
51749-039
FEDERAL CORRECTIONAL INSTITUTION
PO BOX 1000
MILAN, MI 48160

PostalOne!® ME DEC 2024
FRI 06 DEC 2024

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
OFFICE OF THE CLERK
THEODORE LEVIN UNITED STATES COURTHOUSE
231 WEST LAFAYETTE BLVD, Room 564
DETROIT, MICHIGAN 48226